STATE of Utah, Plaintiff and Appellee,

v.

Louie Edwin SIMS, Defendant
and Appellant.

No. 890463–CA.

Court of Appeals of Utah.

March 15, 1991.

G. Fred Metos (Argued), Yengich, Rich, Xaiz & Metos, Salt Lake City, for defendant and appellant.

R. Paul Van Dam, Atty. Gen., Dan R. Larsen (Argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Before GREENWOOD, JACKSON and ORME, JJ.

## OPINION

GREENWOOD, Judge:

Louie Edwin Sims appeals his conviction of possession of a controlled substance with intent to distribute for value, Utah Code Ann. § 58–37–8(1)(a)(i) (Supp.1988), a second degree felony. Sims claims the stop of his vehicle in a roadblock conducted by the Utah Highway Patrol was an unreasonable seizure under the fourth amendment to the United States Constitution and under article I, section 14 of the Utah Constitution.

Following oral argument, three cases relevant to the issues presented in this appeal were decided. Those cases are *Michigan Dep't of State Police v. Sitz,* — U.S. —, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *State v. Larocco,* 794 P.2d 460 (Utah 1990); and *State v. Arroyo,* 796 P.2d 684 (Utah 1990). Accordingly, we granted Sims' motion for supplemental briefing. Having considered the supplemental briefs, we now reverse his conviction, and remand for a new trial in which evidence seized from Sims' vehicle is to be suppressed.

## FACTS

On the morning of July 27, 1988, officers from the Utah Highway Patrol and Juab County Sheriff's Office conducted a roadblock on Interstate Highway 15 approximately two miles south of Nephi, Utah. The roadblock was planned and supervised by Utah Highway Patrol Sergeant Paul Mangelson.[1] Its purpose was to detect driver's license, automobile registration, and equipment violations, as well as liquor and drug violations. Notice that the roadblock would take place was published in the Juab County Times News two to four weeks prior to the roadblock. There was no evidence that the News was distributed outside of Juab County. Interstate 15 is a major north-south route and link between Salt Lake City, Utah and Los Angeles, California.

According to Mangelson, no written policy, from the Highway Patrol or from any

---

**1.** Sergeant Mangelson's efforts to thwart illegal drug trafficking are well known in Utah's appellate courts. *See, e.g., Arroyo,* 796 P.2d 684 (reversing *State v. Arroyo,* 770 P.2d 153 (Utah Ct. App.1989)); *State v. Earl,* 716 P.2d 803 (Utah 1986); *State v. Baird,* 763 P.2d 1214 (Utah Ct. App.1988); *State v. Aquilar,* 758 P.2d 457 (Utah Ct.App.1988). *See also United States v. Corral,* 899 F.2d 991 (10th Cir.1990). Besides the present case, at least one other case involving an automobile search by Sergeant Mangelson is pending in this court. *State v. Kitchen,* No. 900307–CA. As a central player in at least five published search and seizure scenarios to date, the redoubtable trooper's notoriety is approaching that of Max 25, a narcotics detection dog whose nose for crime has figured in at least seven published federal cases in the District of Columbia Circuit. *See United States v. Colyer,* 878 F.2d 469, 471 and n. 2 (D.C.Cir.1989), and cases cited therein.

other source, existed to guide the conduct of the roadblock in question. Mangelson indicated that his supervising lieutenant had given him permission to conduct the roadblock.

The roadblock was staffed by about ten uniformed officers. A series of three signs within a one-half mile distance directed drivers to the roadblock, marked by orange cones. Large trucks were not stopped, because stopping them might cause hazardous traffic congestion. Sergeant Mangelson instructed officers to inspect driver's licenses and vehicle registration of the stopped motorists; while doing this, they were to watch for signs of liquor and drug violations. Officers could hold vehicles for further investigation if the initial contact raised questions. One of the officers, Trooper Carl Howard, indicated that his practice also included asking all drivers, regardless of suspicion, if they had alcohol, weapons, or contraband in their vehicles.[2]

At approximately 9:00 a.m., Sims' vehicle, a Chrysler sedan, was stopped at the roadblock. Trooper Howard, the first officer to contact Sims, saw nothing to cause him to suspect a violation of the law as Sims' vehicle approached.[3] Howard asked for Sims' driver's license and vehicle registration. Sims produced a valid Georgia driver's license and a Utah registration in his name. In response to the trooper's question, Sims stated that he was en route from Los Angeles to Salt Lake City. While talking with Sims, Trooper Howard smelled alcohol inside the sedan and saw an "open" liquor bottle in the back seat area. He asked Sims if there were any alcohol, weapons, or drugs in the vehicle. Sims admitted that there was alcohol in the vehicle, but denied carrying drugs or weapons.

Howard then asked Sims to exit the sedan, and asked for consent to look inside. Sims consented. Sergeant Mangelson approached and helped Howard search the car's interior. They discovered the remnants of one or two marijuana cigarettes in the right rear passenger door ashtray. Howard then asked Sims if he would mind if they searched the trunk of the sedan. Sims agreed and opened the trunk. Mangelson searched the trunk while Howard conducted field sobriety tests on Sims nearby.

In a suitcase in the trunk, Mangelson discovered two small plastic bags containing marijuana. Sims, becoming visibly nervous, then stated that he wanted the search stopped. Mangelson told Sims that, based on the discovery of marijuana, he had probable cause to continue searching the trunk. Looking in the spare tire well, Mangelson found a kilogram brick of cocaine. Sims was then arrested for driving under the influence of alcohol and possession of a controlled substance.

Before trial, Sims filed a motion to suppress all evidence seized from his vehicle, contending that the roadblock stop was an unlawful seizure under the Utah and federal constitutions and that the officers lacked probable cause to search the trunk. Following an evidentiary hearing, the trial court denied Sims' motion. The court determined that (1) the roadblock stop did not violate the Utah or federal constitutions; (2) Sims voluntarily consented to the search of the vehicle, including the trunk; and (3) Sergeant Mangelson had probable cause to continue searching the trunk after Sims' withdrawal of consent. Based on the evidence presented at the suppression hearing and on the parties' written stipulation to the evidence, the trial court found Sims

---

**2.** As indicated by the following exchange at the suppression hearing, an affirmative answer to this question could prompt Trooper Howard to then seek consent to search automobiles without any other suspicion of wrongdoing:

Q (Mr. Metos): Just out of curiosity, did anybody answer "yes" [to query about alcohol, weapons, or contraband] when everything appeared in order so you would have to conduct a further search?

A (Trooper Howard): Yes. I've had several people do that.

**3.** Re-cross examination of Trooper Howard by defense counsel included the following exchange:

Q: You had no reason to believe [Sims] was doing anything wrong as he entered the roadblock or breaking any law; is that correct?
A: That's correct.

guilty of possession of a controlled substance with intent to distribute.

## ISSUES

On appeal, Sims argues that (1) the roadblock stop of his vehicle violated his right to be free from unreasonable searches and seizures under article I, section 14 of the Utah Constitution and the fourth amendment to the United States Constitution; and (2) there was insufficient attenuation between the unlawful detention and any consent to overcome the illegality of the roadblock.

## CONSTITUTIONALITY OF ROADBLOCK

Sims' first point on appeal deals solely with the permissibility of the roadblock itself. Because it is undisputed that the roadblock was conducted with neither a warrant nor suspicion of wrongdoing by Sims, and that no emergency situation necessitated it, the question of whether the roadblock was improper is reduced to one of law, and we review it without deference to the trial court. *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985); *State v. Serpente*, 768 P.2d 994, 995 (Utah Ct.App. 1989).

The State neither contests nor accepts Sims' arguments that the roadblock violated the fourth amendment to the United States Constitution and article I, section 14 of the Utah Constitution. Rather, the State invites us to decide this case solely on the basis of the attenuation issue. That is, we are to "assum[e] arguendo that the stop was illegal," and remand this case for fact finding on whether Sims' consent to search his vehicle was obtained through exploitation of the stop.

■ We believe it inappropriate in this case, however, to simply assume that the roadblock was unconstitutional, without analysis. Sims has steadfastly and thoroughly argued the unconstitutionality of the roadblock, on both federal and state grounds, throughout these proceedings.[4] The transcript of the suppression hearing and the trial court's written findings on the issue provide an ample factual record from which we can assess the constitutionality of this roadblock. The issue, therefore, has been properly preserved and squarely presented on appeal.

We are aware of the rule that we should avoid addressing constitutional issues unless required to do so. *State v. Anderson,* 701 P.2d 1099, 1103 (Utah 1985). This roadblock, however, was not an isolated incident, and our police may continue to use suspicionless roadblocks as a law enforcement tool.[5] This makes all Utah motorists subject to closer police scrutiny than they might expect or, arguably, be legitimately required to encounter.

■ The right of citizens to be secure from unreasonable seizures "*shall not* be violated." U.S. Const. amend. IV; Utah Const. art. I, § 14 (emphasis added). A roadblock or motorist "checkpoint" is a seizure under the fourth amendment, *Michigan Dep't of State Police v. Sitz,* — U.S. —, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990); *State v. Talbot,* 792 P.2d 489, 491 (Utah Ct.App.1990); there is no reason to hold otherwise with respect to our state constitution. For the benefit of our citizens, as well as that of police charged with enforcing our laws, it behooves us to decide whether the roadblock that netted Sims was constitutionally permissible. We hold that it was not.

*Statutory Authority to Conduct Roadblocks.*

■ A prelude to the constitutional analysis per se is a determination of whether any statutory authority either permits or prohibits roadblocks of the sort conducted here, that is, a suspicionless, investigatory roadblock in which vehicles and drivers are

---

**4.** By thoroughly briefing state constitutional concerns in his argument, Sims has answered calls by Utah's appellate courts for a state constitutional analysis of search and seizure issues. *See, e.g., Earl,* 716 P.2d at 805–06; *State v.*

*Shamblin,* 763 P.2d 425, 426 n. 2 (Utah Ct.App. 1988) (citing cases).

**5.** *See, e.g., State v. Talbot,* 792 P.2d 489 (Utah Ct.App.1990).

screened for possible violations of law.[6] We note several statutes of interest, but none apply here.

The Utah Department of Transportation operates ports of entry at which all large vehicles and vehicles transporting livestock are stopped and inspected for, among other things, driver qualifications, registration, tax payments, size and weight, and safety. Utah Code Ann. § 27–12–19 (Supp.1990). Our fish and game laws give the Division of Wildlife authority to conduct roadblocks or game checking stations under Utah Code Ann. § 23–20–19 (1984), which makes it unlawful to fail to stop at such stations. These provisions are obviously inapplicable here.

We also note that the Utah Highway Patrol is charged with the duty of "regulat[ing] traffic on all highways and roads of the state." Utah Code Ann. § 27–10–4(1)(b) (1989). This provision might authorize roadblock-type operations at, for example, accident scenes, or where hazardous road or traffic conditions require extra control. However, because this section in no way implies authority to conduct investigatory operations, it does not apply here.

Utah Code Ann. § 77–7–15 (1990) allows a peace officer to "stop any person in a public place when he has a reasonable suspicion to believe he has committed or is in the act of committing or is attempting to commit a public offense and may demand his name, address and an explanation of his actions."[7] Similarly, Utah Code Ann. § 41–1–17(c) (1988) requires officers to stop a vehicle for driver's license, registration, and general inspection "upon reasonable belief that any vehicle is being operated in violation of any provision of this act or of any other law regulating the operation of vehicles...." These codifications of the familiar "reasonable suspicion" standard of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), were clearly not enacted with roadblock-type stops in mind; rather, they apply to the singling out of particular individuals or vehicles by the police, based on particularized suspicion.

We find nothing in the Utah code that specifically prohibits the roadblock that was conducted here, however. Therefore, we query whether the roadblock was constitutionally prohibited.

*Fourth Amendment.*

■ In *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the United States Supreme Court implied that roadblock stops for the purpose of checking driver's licenses and vehicle registrations might be constitutionally permitted. Holding that a routine stop of an individual vehicle for such purpose, without articulable individualized suspicion of wrongdoing, was impermissible under the fourth amendment, the Court commented that "[t]his holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." *Id.* at 663, 99 S.Ct. at 1401.

*State v. Deitman*, 739 P.2d 616, 617–18 (Utah 1987) (per curiam) (quoting *United States v. Merritt*, 736 F.2d 223, 230 (5th Cir.1984), *cert. denied*, 476 U.S. 1142, 106 S.Ct. 2250, 90 L.Ed.2d 696 (1986)). The level of individualized suspicion, i.e., none, is the same as with a level one stop. However, since drivers were required to stop and had no opportunity to decline to participate, the roadblock stop went well beyond a level one encounter. It did not, however, qualify as a level two or three stop, since no individualized suspicion prompted the stop.

**6.** Under our characterization of this roadblock, it does not fit into the traditional "three levels" of police stops, that have been described as follows:

(1) an officer may approach a citizen at [any time] and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an "articulable suspicion" that the person has committed or is about to commit a crime; however, the "detention must be temporary and last no longer than necessary to effectuate the purpose of the stop"; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed.

**7.** This provision has been characterized as a legislatively enacted version of the so-called level two stop. *See State v. Menke*, 787 P.2d 537, 541 (Utah Ct.App.1990); note 6 *supra*.

The *Prouse* dictum fell on receptive ears, and in *Sitz,* the Court considered an investigatory roadblock, a "sobriety checkpoint," operated by the Michigan State Police Department. The checkpoint was operated under guidelines created by a special state advisory committee composed of law enforcement officials and transportation researchers from the University of Michigan. Those guidelines governed checkpoint publicity, site selection, and police procedure at the checkpoint itself. *Sitz,* 110 S.Ct. at 2483–84.

Under the guidelines, all motorists traveling through the checkpoint were stopped and briefly checked for intoxication. Only if the initial examination revealed signs of intoxication would a motorist would be directed out of the traffic flow for a driver's license and registration check and further sobriety tests. The *Sitz* checkpoint was maintained for one hour and fifteen minutes. During that time, 126 vehicles were stopped for an average of twenty-five seconds each. The checkpoint yielded two arrests—approximately one and one-half percent of stopped drivers—for driving under the influence. *Id.* at 2484.

Utilizing a balancing test developed in *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) and *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court held that Michigan's sobriety checkpoint passed fourth amendment muster. The brief detention of motorists at the checkpoint was found to be only a "slight" infringement of their fourth amendment interests. *Sitz,* 110 S.Ct. at 2486. Outweighing this infringement were "the magnitude of the drunken driving problem [and] the States' interest in eradicating it," *id.* at 2485, along with the Court's assessment that the one and one-half percent drunk driver arrest rate demonstrated that the checkpoint adequately advanced that interest. *Id.* at 2487–88; *see also Brown,* 443 U.S. at 50–51, 99 S.Ct. at 2640 and cases cited therein (permissibility of non-ar-

rest seizure requires weighing public interest served thereby, degree to which it serves the interest, and severity of interference with individual liberty).

According to the testimony of Sergeant Mangelson and Trooper Howard, the roadblock in the present case was of an "all-purpose" variety. All vehicles except trucks were checked for licenses, registration, equipment problems, driver sobriety, and signs of illicit drugs, without any suspicion of wrongdoing. The trial court, focusing on the last purpose, performed a balancing test as described above. It held that "a history of escalating drug traffic along this stretch of Interstate 15 as a result of other arrests, tends to legitimize the public interest in predetermined check points, systematically pursued by officers to minimize the burden to individual citizens without discretion to engage in random roving stops." [8] Without passing judgment on the accuracy of the trial court's balancing, we believe that analysis was premature and therefore erroneous.

 As we read *Sitz, Martinez–Fuerte,* and *Brown,* a fourth amendment balancing test applies to warrantless seizures that, if not based upon articulable suspicion of an individual, "*must* be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown,* 443 U.S. at 51, 99 S.Ct. at 2640 (emphasis added). Additionally, such a plan should be developed by "politically accountable officials" with a "unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." *Sitz,* 110 S.Ct. at 2487. Those officials, and not the courts, are responsible for performing the initial balancing between the fourth amendment and the interests served by the plan. *Id.* While the *Sitz* sobriety checkpoint met these requirements, the roadblock used here did not.

No explicit plan, beyond a determination that all vehicles other than large trucks

---

**8.** The court's definition of the public interest pursued, i.e., detection of illegal drug trafficking, appears to be contrary to testimony about the generalized purposes of the roadblock.

There was no finding as to the actual efficacy of the roadblock in meeting the public purposes described by the officers or the more specific purposes identified by the court.

were to be stopped, governed this roadblock.[9] Nor does it appear that Sergeant Mangelson or the lieutenant who gave him permission to conduct the roadblock are politically accountable officials as contemplated in *Sitz.*[10] The process by which the roadblock was authorized also lacked features of political accountability that were arguably present in *Sitz:* the *Sitz* roadblock was authorized pursuant to careful advance study that included non-police public officials, while authority for this roadblock arose solely within a police agency. Finally, there is no indication that the authorization process here involved any balancing of fourth amendment interests and law enforcement interests, or an assessment of the effectiveness of the roadblock in meeting those interests. Instead, the lack of any written guidelines arising from the authorization process strongly suggests that no such analysis took place.

The requirement of explicit guidelines, developed in a politically accountable manner that includes balancing of the relevant concerns, is, under *Sitz,* a prerequisite to any judicial balancing analysis of a suspicionless roadblock.[11] After-the-fact judicial balancing of the interests implicated by such a roadblock cannot make it constitutionally proper. Therefore, we hold that the roadblock in which Sims was detained violated the fourth amendment to the United States Constitution.[12]

## *Utah Constitution Article I, Section 14.*

The *Sitz* emphasis on roadblock guidelines stresses the principle that when police operations interfere with fourth amendment interests, "the discretion of the official in the field [must] be circumscribed, at least to some extent." *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979) (citations omitted). *Sitz* implicitly places both guideline development and the decision to utilize suspicionless roadblocks in the first place in the hands of "politically accountable" officials. We view roadblock authorization and guideline development as separate steps, however. The initial decision to permit suspicionless roadblocks is especially critical, and requires a higher degree of political accountability than the guideline development step. Sims argues that the lack of statutory authority renders suspicionless roadblocks improper under the

9. While we understand that allowing large trucks to bypass the roadblock may be necessary for safety's sake, we wonder about the implications of this procedure for effective drug interdiction. The procedure seems to invite drug traffickers to transport their contraband in large trucks, and possibly relatively massive quantities, to avoid detection.

10. Compare *United States v. Corral,* 823 F.2d 1389 (10th Cir.1987), upholding the constitutionality of a roadblock for the purpose of checking driver's licenses, vehicle registration, and insurance, pursuant only to the permission of a state police supervisor. *Corral* does not cite *Brown's* requirement, adopted in *Sitz,* of a plan explicitly limiting officer discretion. In view of the reiteration of that requirement we find in *Sitz,* we do not accept *Corral's* implication that supervisory permission to conduct a roadblock constitutes an adequate "plan."

 *Corral* was cited in *United States v. McFayden,* 865 F.2d 1306 (D.C.Cir.1989), which, in turn, was relied on by the trial court in holding the roadblock in this case constitutional. *McFayden* involved "traffic control" roadblocks set up to deal with traffic congestion associated with street level drug trafficking. The *McFayden* roadblocks were found to pass the reasonableness balancing test of *Brown.* Those roadblocks, again in contrast to the present situation, were carried out pursuant to a coordinated plan developed by five District of Columbia police districts.

11. A similar conclusion might well be reached by viewing the roadblock as an "administrative search." Supreme Court cases dealing with such searches have focused on the balance between the need for such searches and the fourth amendment values implicated by such searches. However, the cases also involved situations where the challenged search was, at least arguably, authorized by statute or ordinance. *See Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (federal statute); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (city housing code); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (city building code).

12. Our uncritical treatment of *Sitz* and other federal cases should not be taken as approval of the analysis employed, or result reached, in these cases. We merely accede to the preeminent position of the United States Supreme Court in construing the United States Constitution.

Utah Constitution. As regards the initial authority to permit such roadblocks, we agree.

Article I, section 14 of the Utah Constitution is virtually identical to the fourth amendment. Like its federal counterpart, it consists of a "reasonableness" clause and a "warrant" clause:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

In *State v. Larocco*, 794 P.2d 460 (Utah 1990), the Utah Supreme Court, decrying the United States Supreme Court's "vacillation between the warrant approach and the reasonableness approach" regarding automobile searches, *id.* at 469, reaffirmed its commitment to the warrant approach under our constitution, stating that "[w]arrantless searches and seizures are per se unreasonable unless exigent circumstances require action before a warrant can be obtained." *Id.* at 470 (quoting *State v. Christensen*, 676 P.2d 408, 411 (Utah 1984)).

In *Larocco*, a car theft suspect's expectation of privacy in the interior of the subject car, parked unattended and unlocked on a public street, triggered the application of article I, section 14. 794 P.2d at 468–69. Police officers' warrantless opening of the car's door to view the vehicle identification number on the doorjamb was found to constitute a search subject to the fourth amendment's warrant requirement. The search was then held improper under article I, section 14, because there was no threat that the car would disappear before

a warrant could be obtained to look inside it. The court held that such "exigent circumstances" to support a warrantless search did not exist where the car was not en route away from the officers' jurisdiction and the suspect had not been alerted to police interest in it. *Id.* at 470–71.

Under article I, section 14 our supreme court applies a "warrants whenever possible" policy to motor vehicle searches and seizures. *Id.* This policy is consistent with one fundamental purpose of constitutional search and seizure limits: the interposition of neutral authority between police seeking evidence of crimes and the citizens from whom such evidence is sought.[13]

In the usual non-exigent circumstances search and seizure scenario, the judicial branch, through a magistrate, serves as the neutral authority that issues or denies a warrant to perform a search or seizure. The warrant is issued only when probable cause exists. U.S. Const. amend. IV; Utah Const. art. I, § 14. Our state legislature, however, has also served as a neutral authority between our police and our citizens, in authorizing certain seizures upon less than probable cause.

As already noted, our legislature has followed the courts' lead in authorizing brief warrantless stops of individuals and motor vehicles based on reasonable suspicion.[14] Also as noted, the legislature has acted independently in authorizing ports of entry, as well as fish and game checkpoints. These operations, supported by neither warrants nor any level of individualized suspicion, clearly implicate article I, section 14 of our constitution.

From an operational standpoint, ports of entry and fish and game checkpoints closely resemble the roadblock that was con-

---

**13.** Our analysis under the Utah Constitution is limited to the need for legislative authorization. We note, however, that Justice Durham's opinion in *Larocco*, requires both probable cause *and* exigent circumstances to justify a warrantless search and seizure under article I, section 14, which would seem to prohibit this roadblock and others. However, *Larocco* was a divided decision, with Justice Zimmerman concurring, Justice Stewart concurring in result only, and Justices Hall and Howe dissenting. The final

verdict for Utah roadblocks is, therefore, unknown.

**14.** Arguably, legislative enactment of Utah Code Ann. §§ 77–7–15 (1990) and 41–1–17(c) (1988) may reflect a determination by our legislature to not simply ratify judicial expansion of police power by silent acquiescence, but to determine through the political process whether such expansion is to become a part of Utah's law.

ducted in this case, in that all large trucks, or all vehicles used by hunters, respectively, are submitted to official inspections. However, in authorizing these operations, our legislature has, presumably, weighed the need for such suspicionless inspections against their intrusion upon individual liberty,[15] a process analogous to that performed by a magistrate in the issuance of a warrant. A high degree of political accountability for the institution of these practices can also be presumed, in that representatives of truckers, hunters, law enforcement, and the citizenry at large all very likely played a part in passing the relevant statutes.

In each case of legislation authorizing specific types of checkpoints or stops of persons or vehicles, with or without individualized suspicion of wrongdoing, the citizens of this state have acted through their elected representatives. Therefore, the collective will of the people is expressed and, furthermore, the people have notice of duly authorized police activity.

In stark contrast, the roadblock conducted in this case was authorized solely by police officers, the very people whose behavior article I, section 14 is intended to limit. No non-law enforcement officials took part in the decision to set up the roadblock. Leaving the initial decision to conduct such operations in police hands creates a scheme that is both unrealistic and constitutionally untenable.

■ We believe that legislative authorization of ports of entry and fish and game checkpoints, like the issuance of a judicial warrant, triggers at least some presumption that these law enforcement practices are constitutionally permissible. Because the roadblock in this case had neither form of authorization, it was entitled to no such presumption. Both warrants and statutes originate outside the executive branch, serving to check abuses of that branch's law enforcement power. Consistent with our supreme court's emphasis on the warrant requirement, then, we hold that suspicionless, investigatory motor vehicle roadblocks, conducted without legislative authorization, are per se unconstitutional under article I, section 14 of the Utah Constitution.

In requiring legislative authority as a prerequisite to the use of suspicionless investigatory roadblocks, we join two other western states that have similarly construed their constitutions. *See, e.g., State v. Henderson,* 114 Idaho 293, 756 P.2d 1057 (1988); *Nelson v. Lane County,* 304 Or. 97, 743 P.2d 692 (1987).[16] At least one other state has established the same standard under the fourth amendment. *State v. Smith,* 674 P.2d 562 (Okla.App.1984). This approach is particularly appropriate where a proposed police practice will, as here, affect everyone traveling our state's highways. Because of its close ties to the citizens whose rights will be affected, the minimum necessary political accountability for such practices lies, at the outset, with our legislature.

Our holding that article I, section 14 prohibits suspicionless investigative roadblocks without legislative authority, in effect, requires the legislature to perform the *Sitz*-type balancing function if and when it decides to consider the authorization of such roadblocks. Judicial balancing of the interests implicated by such roadblocks, then, will need to occur only if and when the legislature, upon performing such balancing itself, decides to authorize them.[17]

---

**15.** Indeed, in the case of port of entry stops, the legislature appears to have weighed liberty concerns with some care. Vehicles normally subject to these stops are exempted from stopping if doing so would increase their one-way trip distance by more than three miles or five percent. Utah Code Ann. § 27–12–19.4(1) and (3) (Supp. 1990).

**16.** In *Pimental v. Dep't of Transp.,* 561 A.2d 1348 (R.I.1989), and *Commonwealth v. Tarbert,* 348 Pa.Super. 306, 502 A.2d 221 (1985), the Rhode Island Supreme Court and the Superior Court of Pennsylvania held sobriety checkpoints unconstitutional under their state constitutions without considering whether such practices could be valid if statutorily authorized.

**17.** We note that the factors to be considered in performing such balancing are myriad, complex, and subject to debate. *See, e.g., Sitz* and dissenting opinions of Brennan and Stevens, JJ.; *Nelson v. Lane County,* 743 P.2d at 710–11 (appendix); *see also* Davis & Wallentine, *A Model*

We, unlike our colleague in his concurring opinion, prefer that the legislature announce its view of public policy and the philosophy of Utah's citizenry as regards roadblocks, prior to the court applying constitutional analysis to the legislature's product.[18]

We also emphasize that our holding on the state constitutionality of the roadblock in which Sims was stopped is limited in its application to similar, non-emergency situations. It is not intended to apply to emergency roadblocks that might, for example, be used to apprehend a fleeing felon. Nor do we intend to impede any existing authority to conduct roadblocks for traffic control purposes. Any constitutional challenge to these types of traffic stops awaits another day. It is the suspicionless, investigative, non-emergency roadblock, conducted in the absence of legislative authority, that we hold to be unconstitutional.

## ATTENUATION OF CONSENT FROM ILLEGAL ROADBLOCK

Sims argues that there was insufficient attenuation between his detention and the consent he gave to search his vehicle to purge the taint of the illegality of the detention. He does not claim that his consent was coerced from him and was therefore involuntary. Rather, he argues that because there were no intervening circumstances between the detention and the consent, the consent was the fruit of the illegal detention, and, therefore, evidence seized pursuant to his consent should have been ordered suppressed. Sims did not make this argument in the trial court.

Normally, "where a defendant fails to assert a particular ground for suppressing unlawfully obtained evidence in the trial court, an appellate court will not consider that ground on appeal." *State v. Carter,* 707 P.2d 656, 660 (Utah 1985); *see also State v. Webb,* 790 P.2d 65, 71 n. 2 (Utah Ct.App.1990); Utah R.Crim.P. 12. Unless a ground for suppression is "unknown or unavailable" to a defendant at the time a suppression motion is filed, the right to challenge the admission of evidence on that ground is waived. *State v. Lee,* 633 P.2d 48, 53 (Utah 1981). Here, however, because our then-standing decisions effectively held that a non-coerced search consent, by itself, purged the taint of a primary illegality, Sims' non-attenuation argument was unavailable to him in the trial court and would have been pointless to assert. *See State v. Sierra,* 754 P.2d 972, 980 (Utah Ct.App.1988). Therefore, it is proper to address that argument now.

In *State v. Arroyo,* 796 P.2d 684 (Utah 1990), the Utah Supreme Court, reversing this court's holding in *State v. Arroyo,* 770 P.2d 153, 155–56 (Utah Ct.App.1989), held that, to be constitutionally valid, a search consent following illegal police behavior must be both non-coerced and not arrived at by exploitation of the primary police illegality. Factors used to evaluate the non-exploitation or attenuation element are derived from *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), which involved a confession obtained from a criminal suspect after his illegal arrest. They include the temporal proximity of the primary illegality and the granting of consent, the presence or absence of intervening circumstances, and the purpose and flagrancy of the illegal police conduct. *Arroyo,* 796 P.2d at 690–91 n. 4 (citing *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62, and 3 W. LaFave, *Search and Seizure* § 8.2(d), at 193–94 (2d ed. 1987)).

for Analyzing the Constitutionality of Sobriety Roadblock Stops in Utah, 3 B.Y.U.J.Pub.L. 357 (1989). Political and economic considerations that are the particular province of the legislature may also come into play: Utah's economy benefits greatly from tourism, and the state is also currently attempting to attract the Winter Olympic Games. Our legislators may well wish to consider the possible impact of suspicionless roadblocks upon visitors to our state.

18. It may be that lifestyle in the western states promotes a greater expectation of privacy in our automobiles than in other states or in the United States Supreme Court's enunciation of the "automobile exception" under the fourth amendment. *See California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).

▪ The *Arroyo* case was remanded to the trial court for fact finding on the issue of whether the defendant's consent to search his vehicle was attenuated from or an exploitation of his illegal stop. Because the burden is on the State to show that evidence obtained following illegal police conduct is attenuated from the illegality, *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262, and because the attenuation issue was not presented to the trial court, a remand to examine the attenuation factors has been suggested here. We find, however, that the record now before us contains "sufficient detail and depth" to allow us to determine the issue as a matter of law. *See id.*

Regarding the temporal proximity factor, the record demonstrates a very short time span between Sims' stop in the roadblock and Trooper Howard's request to search his automobile. The trooper had but a brief conversation with Sims, regarding his license and registration, his trip itinerary, and possession of alcohol, guns, or contraband, before asking for consent to search his car. The consent was obtained within minutes of the illegal stop, and not even under our clear error standard of review could the trial court find enough time between the stop and the grant of consent to attenuate the relationship between the two.[19]

Nor does the record reveal any possibility of intervening circumstances between the illegal stop and Sims' grant of consent to the search. Such circumstances must be independent of the primary illegality. *Arroyo*, 796 P.2d at 690–91. Here, Trooper Howard's request for consent to search Sims' sedan was based upon the smell of alcohol, the sight of the open liquor bottle in the sedan, and Sims' admission, uneventful since the bottle was in obvious view, that he was carrying alcohol. Howard's opportunity to make these observations and to question Sims, however, depended entirely on the illegal roadblock. Neither Sims' driving nor the external appearance of his vehicle justified stopping him. Nothing occurred which could have reasonably made him feel free to proceed on his journey at any time between the moment of his stop and the discoveries that prompted the trooper's request for consent to search his vehicle.[20] Sims did not spontaneously volunteer his consent, but gave it only when asked. Sims' consent, then, arose from an unbroken chain of events that began with the illegal roadblock.

The final factor in the attenuation analysis is an examination of the purpose and flagrancy of the primary police illegality. Here, this factor, unlike the first two, appears unrelated to the question of whether a search consent flowed from, i.e., was an exploitation of, the illegal police conduct.[21] Instead, it appears to be an alternative approach, inviting us to overlook unconstitutional police conduct that serves good purposes and is not too flagrant.

Troopers Howard and Mangelson testified at some length about their expertise in drug interdiction, and the trial court treated the roadblock as if that was its primary purpose. However noble this purpose might be, it was pursued by an unauthorized means. The troopers each had years of law enforcement experience, and can properly be charged with awareness that their action was not authorized by law. "The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 573, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Using ten to twelve law officers to staff the roadblock may have also left distant parts of the largely rural jurisdiction with delayed police assistance in the event of need. Thus,

---

19. We note that in *Brown*, an interval of less than two hours between an illegal arrest and the obtaining of an incriminating statement from the arrestee was viewed as insufficient to attenuate the statement from the arrest. 422 U.S. at 604, 95 S.Ct. at 2262.

20. Additionally, Trooper Howard testified that, once the open container was discovered, Sims

was, in fact, not free to leave, but was subject to citation and to field sobriety testing.

21. By contrast, in *Brown v. Illinois*, the Supreme Court seems to have regarded an illegal arrest, that appeared "calculated to cause surprise, fright, and confusion," 422 U.S. at 605, 95 S.Ct. at 2262, as a causative factor producing the arrestee's subsequent incriminating statements.

although it does not appear that the officers behaved abusively toward those stopped at the roadblock, this does not correct the constitutional violation.

In sum, the record demonstrates that Sims' consent to search his vehicle was arrived at by exploitation of the illegal roadblock. Accordingly, that consent was invalid. Because the exclusionary rule applies to violations of both the fourth amendment and article I, section 14 of the Utah Constitution, *State v. Larocco*, 794 P.2d 460, 471–73 (Utah 1990), all evidence obtained under that consent must be suppressed.

## PROBABLE CAUSE TO CONTINUE SEARCH

Troopers Howard and Mangelson believed that the discovery of marijuana in Sims' sedan under the consent search gave them probable cause to continue searching after consent was withdrawn. However, because the initial consent was invalid, any probable cause found while searching under that consent was also invalid. Absent probable cause to search the sedan without Sims' consent, we need not reach the issue of whether exigent circumstances existed to make the warrant requirement inapplicable.

## CONCLUSION

Sims' conviction for possession of a controlled substance with intent to distribute is reversed, and the case is remanded to the trial court for proceedings in accord with this opinion.

JACKSON, J., concurs.

ORME, Judge (concurring specially):

While I otherwise concur fully in the court's opinion, I have two difficulties with the discussion treating the roadblock under article I, section 14, of the Utah Constitution. First, if the roadblock cannot even be validated under the questionable "balancing" approach of *Michigan v. Sitz*, —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), *see, e.g., id.* at 2490–99 (Stevens, J., dissenting), we have no need to examine whether it might be additionally invalid under the state constitution. Second, and more importantly, I am not enthusiastic about suggesting that the legislature, any more than the courts or the police, should be about the business of balancing away important constitutional protections that safeguard all of us so that law enforcement can more readily catch an occasional law-breaker. The citizen's right to be free from police intrusion in the total absence of even the least suspicion of wrong-doing should simply not be at the mercy of the legislature's determination of how tourism or our hopes for the Olympics might somehow be adversely impacted by one law enforcement technique or another.

If it were necessary to reach the state constitutional issue in this case, i.e., if the roadblock passed muster under the federal constitution, I would be more inclined to solidify long-standing constitutional precepts as at the core of article I, section 14, than to borrow the troublesome "balancing" approach embraced in *Sitz*, adopt some variation of that approach, and begin a journey down that nebulous path. *Cf. State v. Larocco*, 794 P.2d 460, 469 (Utah 1990) (state constitutional analysis employed "to simplify ... the search and seizure rules so that they can be more easily followed by the police and the courts and, at the same time, provide the public with consistent and predictable protection against unreasonable searches and seizures"). I would probably prefer to hold that the rule of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), uniformly applied by Utah courts, is a matter of Utah constitutional law that simply may not be balanced away by any branch of our government and that is not amenable to a roadblock exception.

Under established Utah decisional law, in the absence of *any* individualized suspicion, only a level one stop is permitted. *E.g., State v. Jackson*, 805 P.2d 765, 766 (Utah Ct.App.1990); *State v. Menke*, 787 P.2d 537, 570 (Utah Ct.App.1990); *State v. Trujillo*, 739 P.2d 85, 87–88 (Utah Ct.App. 1987). A level one stop is a purely voluntary encounter. *Id.* And one does not lose

the right to decline to participate in a level one encounter simply because one chooses to drive rather than to walk. *See State v. Smith,* 781 P.2d 879, 881 (Utah Ct.App. 1989); *State v. Johnson,* 771 P.2d 326, 328 (Utah Ct.App.1989), *rev'd on other grounds,* 805 P.2d 761 (Utah 1991). *See also, Delaware v. Prowse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (persons do not lose the protections of fourth amendment "when they step from the sidewalk into their automobiles"); *State v. Talbot,* 792 P.2d 489, 491, 494 (Utah Ct.App.1990).

If, as seems clear, the police cannot *require* every pedestrian on a stretch of sidewalk to stop and answer police inquiries, I am hard-pressed to see how they can stop every car on a stretch of the interstate highway and require the driver to answer inquiries. In my view, the only roadblock that is sure to pass state constitutional muster is one which would qualify as a level-one stop. *Cf. Little v. State,* 300 Md. 485, 479 A.2d 903, 906 (1989) (roadblock upheld where motorists avoiding roadblock or otherwise refusing to cooperate not detained). I see no constitutional problem with a roadside police checkpoint announced by a sign on the freeway, "Police Roadblock Next Exit. Your Cooperation in Answering Police Inquiries Appreciated." Most drivers would stop, even though they could not be required to, just as most pedestrians will stop and respond to police inquiries on the sidewalk. But on neither medium of travel can one suspected of nothing illegal whatsoever be compelled to do so.