**UNITED STATES of America,**

v.

**Gregory McFAYDEN, Appellant.**

**No. 87–3096.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 13, 1988.

Decided Jan. 24, 1989.

---

Richard S. Stern, Washington, D.C., appointed by the Court, for appellant.

Patricia A. Riley, Asst. U.S. Atty. with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell and Elizabeth Trosman, Asst. U.S. Attys., were on the brief, for appellee.

Before EDWARDS and WILLIAMS, Circuit Judges, and REYNOLDS *, Senior District Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Gregory McFayden ("appellant") appeals a decision of the District Court denying his motion to suppress evidence of narcotics that were inadvertently discovered in his automobile after it was stopped at a police traffic roadblock. The appellant claims that the roadblock was unconstitutional because it served no legitimate governmental interest. Therefore, according to the appellant, because the police had no reasonable suspicion to believe that either he or his automobile were subject to seizure for violation of the law, his Fourth Amendment rights were infringed when his car was seized at the roadblock. The District Court rejected the Fourth Amendment claim, finding that the appellant's automobile was lawfully stopped at a fixed traffic checkpoint. We affirm.

The Supreme Court has held that stops of vehicles are permissible if made either at fixed traffic checkpoints *or* on reasonable suspicion. In any case, a stop must be "judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). In the instant case, because of its legitimate purpose and limited scope, we find that the roadblock passes constitutional muster: it was established to respond to identified problems of traffic congestion; it was designed to improve traffic enforcement in neighborhoods experiencing serious problems; its principal purpose was to allow police to check for a driver's license and vehicle registration; it advanced the legitimate governmental interests it was designed to serve; it was open and highly visible; the police were required to check all cars at the roadblock, with no discretion to engage in random or roving stops; drivers were not detained at the roadblock once they produced a valid license and registration, unless other facts came to light during the check which created a reasonable suspicion that the driver was engaged in some criminal activity; and, even though the traffic checkpoint facilitated a narcotics enforcement effort, there is no evidence that it was a subterfuge principally designed to detect crimes unrelated to driver licensing and vehicle registration. We agree with the District Court that, on these facts, the appellant suffered no violation of his Fourth Amendment rights.[1]

---

\* Of the United States District Court for the Eastern District of Wisconsin, sitting by designation pursuant to 28 U.S.C. § 294(d).

**1.** Following the denial of the motion to suppress, the appellant entered a conditional plea of guilty to conspiracy to possess cocaine with intent to distribute, 21 U.S.C. § 841(a) (1982). On October 26, 1987, he was sentenced to two years incarceration, subject to this Court's ruling on the motion to suppress.

## I. BACKGROUND

### A. Traffic Roadblocks Associated With "Operation Cleansweep"

On August 31, 1986, the Metropolitan Police Department began "Operation Cleansweep," a coordinated effort in the Third, Fourth, Fifth, Sixth, and Seventh Police Districts of the District of Columbia designed to attack the problem of drug dealing in D.C. The law enforcement effort came as a result of "untold complaints" from citizens and from monthly reports from vice units that indicated a marked increase in street level drug trafficking. See Transcript ("Tr.")[2] I–78–81.

The testimony in this case indicates that traffic congestion is one serious problem that results from street drug sales in the District of Columbia. Drug dealers stand on sidewalks and step out into moving traffic to advertise their wares. Traffic flow is disrupted by buyers stopping illegally, making U-turns, or double-parking in order to make drug purchases. The amount of both vehicular and pedestrian traffic increases in such drug dealing areas. It is not uncommon for 200 to 300 people to gather at a street corner, bringing the movement of vehicles and pedestrians to a virtual standstill.

As part of Operation Cleansweep, temporary roadblocks were set up to control the traffic congestion that resulted from street drug sales. The main purpose of the roadblocks was to allow police to regulate vehicular traffic by checking drivers' licenses and vehicle registrations; police officers acknowledged, however, that they were hopeful that the roadblocks would also have a "halo" or "spin-off" effect of deterring drug trafficking. See Tr. I–25, 72, 84–85, 101–03.

In the Sixth District, where the appellant was apprehended, the District Commander decided on the location of the roadblocks on the basis of community complaints about traffic and narcotics problems. Police were instructed to stop all cars passing through the roadblocks in both directions to check licenses and registrations. If a driver's license and registration were in order, the car would be permitted to continue within a matter of seconds; if not, the car would be pulled out of line so that a computer check could be run, which would take a few minutes. If the driver had no license or registration, or if the license had been suspended or revoked, the driver would be arrested; if the license had expired or the driver had forgotten it, he or she would receive a traffic ticket.

From August 29 to October 23, 1986, 77 roadblocks were established in the Sixth District, leading to 243 arrests. Tr. I–19, 43–46. Of these arrests, 39 were for criminal conduct not related to traffic, including outstanding warrants and disorderly conduct. Ten arrests were for narcotics offenses: including 9 misdemeanors and 1 felony. Tr. I–20, 48. Seven of these arrests were initially for traffic offenses, but narcotics were found in searches incident to the arrests. Only 3 narcotics arrests, including the appellant's, did not involve traffic charges. Tr. I–19–20. City-wide, there were 1,101 arrests associated with Operation Cleansweep between August 30 and November 1, 1986. Most of these arrests, i.e., 905 of the 1,101 (or 82%), were for traffic offenses. Tr. I–92, 93, 117–18, 121.

### B. The Roadblock at Which the Appellant was Stopped

On September 10, 1986, the police installed a roadblock at the intersection of 58th and Ames Streets, Northeast, between the hours of 12:00 noon and 6:00 p.m. Deputy Chief Melvin High testified that the area was primarily residential, that it included public housing, and that residents and

---

2. "Tr. I-" refers to the 143–page transcript, bound in two volumes, dated November 5 and 6, 1986, which includes the testimony of Lieutenant Lingerfelt, Deputy Chief High, and Assistant Chief Fulwood, and the arguments of counsel. "Tr. II-" refers to the 58–page transcript, bound in two volumes, dated November 5, 1986, which includes the testimony of Sergeant Daniel and Officer Fitts. "Tr. III-" refers to the 9–page transcript dated November 6, 1986, which contains the court's ruling on appellant's motion to suppress. "Tr. IV-" refers to the 315–page transcript, dated November 24–26, 1986, bound in two volumes, of the trial.

property managers had complained about speeding automobiles, traffic congestion and drug trafficking. Tr. I–60–61. Sergeant David Daniel, the field officer, understood the roadblock to be for traffic purposes, although he knew that Operation Cleansweep personnel were involved. Tr. II–34, 46–47.

Between ten and twenty flares were set up along the center of 58th Street, going north from the intersection at Ames Street. An officer instructed motorists entering the traffic roadblock to have their licenses and registrations ready. At least one marked police car was parked near the flares, and eight to ten uniformed officers were also on the scene. The officers were told to stop every car in both directions and to check licenses and registrations. No special instructions were issued to look out for narcotics or paraphernalia, although the officers were assumed to be normally observant. An estimated twenty to forty cars passed through the roadblock each hour.

At about 5:30 p.m. on September 20, 1986, the appellant entered the roadblock on 58th Street and attempted to leave it by turning left onto Ames Street. On Ames Street, Officer Cynthia Fitts asked the appellant to stop his car. The officer was instructed to stop every car, including any cars that turned onto another street to avoid the roadblock. She was also instructed to check permits and registrations. Sergeant Daniel walked over to assist Officer Fitts. A passenger in the appellant's automobile left the vehicle without being stopped by the police officers, and walked into a nearby apartment complex.

The appellant stepped out of the car and told Sergeant Daniel that either his license or registration was in the trunk. Sergeant Daniel watched the appellant open a briefcase in the trunk, and saw that it contained a large quantity of money. When Sergeant Daniel cautioned the appellant about carrying so much money with him, the appellant explained that he had a lot of bills to pay. The appellant voluntarily told the officer that "there are no drugs in there" and invited Sergeant Daniel to look in the

trunk, which the officer did. Tr. II–36. The appellant then indicated that his registration was in the glove compartment. In the meantime, Officer Fitts examined the driver's permit and ran a computer check, which disclosed no irregularities.

Concerned that bystanders might take the money in the trunk, Sergeant Daniel told the appellant to keep it with him. The appellant retrieved the money and entered the car on the right side. Sergeant Daniel walked along the left side and opened the driver's door. At that moment, the appellant lunged for a bag on the floor of the car. Tr. IV–78. The officer reached it first, fearing that it might contain a weapon. The officer found that the bag contained, instead, small bags of white powder, which the officer believed to be narcotics. The appellant was then placed under arrest.

## C. *The District Court's Ruling on the Motion to Suppress*

The District Court denied the appellant's motion to suppress the evidence, finding that the operation of the roadblock had satisfied Fourth Amendment standards of "reasonableness." Tr. III–2. Pointing to Supreme Court precedent, the trial court ruled that the Fourth Amendment standards of reasonableness apply to roadblocks, *see Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and that "reasonableness" was determined by balancing the extent to which a seizure intrudes on individual liberty against its advancement of important governmental interests. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

Applying this balancing test, the trial court found that the evidence supported the reasonableness of the roadblocks. Drivers were required only to produce their licenses and registration; they were not searched, or asked questions, or required to leave their cars. Tr. III–5. There was no racial discrimination involved in the selection of the roadblock sites. *Id.* Finally, the court found that the roadblock advanced the interests it was designed to serve. There were numerous traffic ar-

rests, a substantial number of arrests for outstanding warrants, and deterrence of open drug trafficking on the streets because of the high visibility of the traffic checkpoint program. Tr. III–7–8.

## II. ANALYSIS

 The roadblock at issue was conducted in a systematic and nondiscriminatory fashion, for the principal purpose of traffic enforcement in connection with a police program to curb drug trafficking. The intrusion on personal liberty was minimal, and the roadblock was a means reasonably calculated to achieve its purpose. Accordingly, we find that the roadblock met the Fourth Amendment standard of reasonableness, and that the District Court's denial of the motion to suppress the evidence should therefore be affirmed.

### A. *The Fourth Amendment Standard*

The Supreme Court has clearly established that "stopping an automobile and detaining its occupants constitutes a 'seizure'" within the meaning of the Fourth and Fourteenth Amendments, "even though the purpose of the stop is limited and the resulting detention quite brief." *Prouse*, 440 U.S. at 653, 99 S.Ct. at 1396 (citation omitted). Such seizures are unconstitutional, however, only if they are unreasonable. The Court explained that "[t]he essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions.'" *Id.* at 653–54, 99 S.Ct. at 1395–96 (citation omitted).

In determining the "reasonableness" of a seizure, a court must balance "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979). To withstand Fourth Amendment scrutiny, a seizure must "be based on specific, objec-

tive facts indicating that society's legitimate interests require the seizure of the particular individual, *or ... the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers."* *Id.* (citations omitted) (emphasis added).

These general principles have been applied in several cases involving automobile checkpoints. In *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court upheld the stopping of motor vehicles on a highway near Mexico for brief questioning to determine whether illegal aliens were on board. The Court held that "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by a warrant." *Id.* at 566, 96 S.Ct. at 3087. The Court explained that "[t]he regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest." *Id.*, 428 U.S. at 559, 96 S.Ct. at 3083; *see also United States v. Ortiz*, 422 U.S. 891, 894–95, 95 S.Ct. 2585, 2587–88, 45 L.Ed.2d 623 (1975) (noting that "[a]t traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion").

Three years later, in *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979), the Supreme Court struck down a police practice of *random* stops of vehicles to check drivers' documents. The Court found that "[s]tates have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." *Prouse*, 440 U.S. at 658, 99 S.Ct. at 1398. The Court held, however, that Delaware's use of discretionary spot checks only marginally contributed to roadway safety; therefore, the state could not justify "sub-

jecting every occupant of every vehicle on the roads to a seizure." *Id.* at 661, 99 S.Ct. at 1400. The Court expressed particular concern about the "unbridled discretion of law enforcement officers," *id.*, which " 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches.' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)). The Court concluded that the "[q]uestioning of all oncoming traffic at roadblock-type stops is [a] possible alternative." *Id.* at 663, 99 S.Ct. at 1401.[3]

In somewhat varying circumstances, several courts of appeals have reviewed the constitutionality of automobile roadblocks. In *United States v. Hernandez*, 739 F.2d 484, 488 (9th Cir.), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 441, 83 L.Ed.2d 366 (1984), for example, the Ninth Circuit held that a *clearly visible* traffic checkpoint, pursuant to a routine inspection of all vehicles for illegal aliens, was not an unreasonable search under the Fourth Amendment. Similarly, the Tenth Circuit in *United States v. Corral*, 823 F.2d 1389 (10th Cir. 1987), *cert. denied*, — U.S. ——, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988), held that it was lawful for two officers (with the consent of their supervisor) to set up a roadblock to check drivers' licenses, vehicle registrations and proof of insurance. The court found that because the roadblock "was established in a systematic manner to stop vehicles in a pattern which protected the public from the officers' unbridled discretion," it passed constitutional muster. *Id.* at 1392. *See also United States v. Venegas–Sapien*, 762 F.2d 417 (5th Cir. 1985) (upholding a temporary highway checkpoint that was established to catch illegal-alien transporters trying to skirt permanent checkpoints).

Moreover, in an opinion which presaged *Prouse*, this court addressed the use of automobile roadblocks conducted in a systematic fashion, albeit in dicta. *See United States v. Montgomery*, 561 F.2d 875 (D.C. Cir.1977). The issue in *Montgomery* was whether a "spot check" of a driver's license and registration was constitutional. Police officers had pulled a car from the road to check the driver's license and registration because the driver seemed "suspicious" in watching the officers through his rear view mirror. The court held that such a search was unreasonable under the Fourth Amendment. In so holding, the court explained that "[a] roving police stop is a more serious intrusion than a predicted checkpoint inspection, because the unexpected stop is pregnant with greater annoyance and inconvenience, and more likely to frighten or embarrass." *Id.* at 883 (footnote omitted). The court went on to suggest that one permissible format for enforcing motor vehicle laws would be to "use predetermined checkpoints, at which vehicles could be stopped for permit inspection." *Id.* These checkpoints "could be changed to different locations, with frequent rotation. Public response to such a systematic program would insure that it does not become too burdensome to individual citizens." *Id.* The "important point," the court concluded, "is that the stops be made in some *systematic* fashion, prescribed in advance by superiors." *Id.* at 884 (emphasis in original).

These decisions establish several factors that must be present in order for an automobile checkpoint to pass constitutional scrutiny. First, there must be a legitimate state interest at stake. In *Prouse*, the Court determined that regulating vehicular traffic is one such interest. *See Prouse*, 440 U.S. at 658, 99 S.Ct. at 1398. Second, the checkpoints must serve to promote the state interest in a "sufficiently productive" fashion. *Id.* at 660, 99

---

**3.** In *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), the defendant was stopped at "a routine driver's license checkpoint [on a city street in Fort Worth, Texas]." *Id.* at 733, 103 S.Ct. at 1539. The plurality opinion notes that "[t]he Court of Criminal Appeals stated that it did not 'question ... the validity of the officer's initial stop of appellant's vehicle as part of a license check,' [*Brown v. State* ] 617 S.W.2d [196] at 200 [1981], and we agree. *Delaware v. Prouse, supra*, [440 U.S.] at 654–55 [99 S.Ct. at 1396–97]." *Id.* at 739, 103 S.Ct. at 1542. The separate concurring opinions address other points and do not take issue with the plurality's characterization of the "license checkpoint" as a lawful traffic roadblock.

S.Ct. at 1397. In *Prouse,* the Court determined that, "[i]n terms of actually discovering unlicensed drivers or deterring them from driving, the spot check does not appear sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment." *Id.* Third, the checkpoints must be minimally intrusive: (1) they must be clearly visible; (2) they must be a part of some systematic procedure that strictly limits the discretionary authority of police officers; and (3) they must detain drivers no longer than is reasonably necessary to accomplish the purpose of checking a license and registration, unless other facts come to light creating a reasonable suspicion of criminal activity. *See id.* at 662, 99 S.Ct. at 1400; *Martinez–Fuerte,* 428 U.S. at 558–59, 96 S.Ct. at 3083–84; *Brown v. Texas,* 443 U.S. at 51, 99 S.Ct. at 2640–41.

There is one additional factor that must be considered in any assessment of the legality of a police traffic roadblock. It is possible that a roadblock purportedly established to check licenses could be located and conducted in such a way as to indicate that its *principal purpose* was the detection of crimes unrelated to licensing. 4 LaFave, Search and Seizure § 10.8(a), at 63–64 (1987). Such a subterfuge might result in an infringement of Fourth Amendment rights, and some courts have so held. *See, e.g., id.* at 64 n. 54. However, the "subterfuge" situation should not be confused with a lawful stop. This point was explained in *United States v. Prichard,* 645 F.2d 854 (10th Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981):

> The purpose of the roadblock, *i.e.,* to check drivers' licenses and car registrations, [is] a legitimate one. If, in the process of so doing, the officers [see] evidence of other crimes, they [have] the right to take reasonable investigative steps and [are] not required to close their eyes.

*Id.* at 857 (citation omitted). In other words, "[t]he law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks...." *United States v. Lopez,* 777 F.2d 543, 547 (10th Cir.1985); *see also* LaFave, Search and Seizure § 10.8(a), at 64 & n. 58.

**B.** *The Roadblock at Issue*

The appellant argues that the roadblock at issue in this case constituted an "unreasonable" seizure in violation of the Fourth Amendment because the roadblock was unnecessary to control traffic or to deter drug trafficking, and it did not serve to achieve these aims. We disagree, and find that the roadblock operated as a "reasonable" seizure in accordance with Supreme Court precedent.

First, we reject the appellant's characterization of the roadblocks as a subterfuge seizure technique for capturing drug dealers. Rather, we find that the evidence in this case amply demonstrates that the principal purpose of the roadblock was to regulate vehicular traffic by allowing police to check drivers' licenses and vehicle registrations. The fact that there may have been a "halo" or "spin-off" effect of deterring drug sellers and buyers from trafficking in areas where a roadblock was posted did not make an otherwise legitimate checkpoint unlawful.

Motorists and residents alike had been complaining about serious traffic and crime problems generated by the open drug sales on the streets. Deputy Chief High testified at trial that he "received numerous calls and complaints about speeding automobiles, congestion of traffic, those kinds of things" in the 58th Street area. Tr. I–60. Assistant Chief of Police Isaac Fulwood also testified that there was a higher incidence of traffic congestion, moving and parking violations, and unlicensed and impaired drivers entering drug dealing areas. Tr. I–80. Moreover, supervising officers in Operation Cleansweep testified that they did not expect the roadblocks to reveal many narcotics violations and that field officers were merely instructed to check drivers' licenses and registrations. *See* Tr. II–11. It is immaterial that the roadblocks were established in association with the Operation Cleansweep drug enforcement program. What is critical here is that (1) the roadblocks were established to deal with identified problems of traffic congestion, and (2) the principal purpose of the

checkpoints was to allow police to check a driver's license and vehicle registration. Whatever advantage was gained in drug enforcement was coincidental to the principal purpose of the traffic roadblocks.

Second, the evidence shows that the roadblock program advanced the legitimate interests it was designed to serve. For example, the arrest rates in the Sixth District compare favorably with the arrest rate at the checkpoint upheld in *Martinez–Fuerte*, 428 U.S. at 554, 96 S.Ct. at 3081; at which 17,000 illegal aliens were apprehended at a checkpoint through which approximately 7 million cars passed, an apprehension rate of .24 percent. In this case, the Government estimates that "[r]oughly 2.5 percent of the drivers stopped had committed or were committing a traffic offense so serious as to warrant arrest. An additional .5 percent had violated or w[ere] violating a criminal law." *See* Brief for Appellee at 29–30. These percentages reflect a higher rate of apprehension than found in *Martinez–Fuerte* and demonstrate the effectiveness of the roadblocks for the stated purpose. The appellant does not dispute this point.

Third, we find that the operation of the roadblock observed the Fourth Amendment standard of minimal interference with individual liberty. The intended use of roadblocks was announced at a news conference several days before the appellant was stopped. The roadblock was marked by flares, and a police car and uniformed police officers standing by. The first officer to approach the car gave the driver notice that the police were checking licenses and registrations, and that the roadblock was authorized. Accordingly, the "subjective intrusion"—the fear induced in lawful travelers—was minimal. *See Prouse*, 440 U.S. at 656, 99 S.Ct. at 1397. Furthermore, drivers were not detained at a roadblock once they produced a valid license and registration, unless other facts came to light during the check which created a reasonable suspicion that the driver was engaged in some criminal activity.

Finally, the roadblock was "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers," *Brown v. Texas*, 443 U.S. at 51,

99 S.Ct. at 2640, and did not vest "standardless and unconstrained discretion," *Prouse*, 440 U.S. at 661, 99 S.Ct. at 1400, in the officers operating the checkpoint. The initial decision to use roadblocks was made by Assistant Chief Fulwood. Tr. I–84. He explained that the "traffic problem had become so severe" in the Sixth District that "we requested the Department of Public Works to put up no parking signs." *Id.* A list of possible roadblocks was determined in advance by the District Commander on the basis of community complaints. The 58th Street roadblock was included in this list. Roadblocks were supervised by non-field officials. The field officers were specifically instructed to check licenses and registrations of all the cars passing in either direction, and they did so in a systematic and preplanned fashion. The police had no discretion to engage in random or roving stops.

### III. Conclusion

For the foregoing reasons, we hold that the roadblock at issue in this case satisfied the strictures of the Fourth Amendment. Accordingly, the judgment of the District Court denying the appellant's motion to suppress is hereby

AFFIRMED.