**UNITED STATES of America,
Appellee,**

v.

**Mark Stephen DAVIS, Appellant.**

**No. 00–3050.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 2001.

Decided Nov. 16, 2001.

A.J. Kramer, Federal Public Defender, argued the cause and filed the briefs for appellant. Gregory L. Poe, Assistant Federal Public Defender, entered an appearance.

Catherine A. Szilagyi, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman and Neil H. MacBride, Assistant U.S. Attorneys. Mary-Patrice Brown, Assistant U.S. Attorney, entered an appearance.

Before: RANDOLPH, ROGERS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

The police stopped Mark Davis at a roadblock in 1999, arrested him for traffic offenses, searched him and his automobile, and recovered evidence of his drug dealing, for which the grand jury indicted him. After the district court denied Davis's motion to suppress, he entered a conditional plea of guilty to possession with intent to distribute crack cocaine. The issue in Davis's appeal is whether the roadblock complied with the Supreme Court's interpretation of the Fourth Amendment to the Constitution in *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), decided after Davis had noted his appeal, and with *United States v. McFayden,* 865 F.2d 1306 (D.C.Cir.1989), on which the district court relied in denying the motion to suppress.

The roadblock had been set up as part of the Metropolitan Police Department's "Summer Mobile Force." The evidence at the suppression hearing consisted of the testimony of one government witness—a sergeant assigned to this task force—and a sheaf of internal police documents, submitted by the defense, describing the Summer Mobile Force. The circumstances of Davis's stop and arrest at the roadblock need not be recited in detail. The events occurred early in the evening in a southwest D.C. neighborhood. Safety flares lined the street. Forty to fifty officers and seven to ten marked police cars were at the scene. All vehicles approaching the

roadblock were stopped. Davis pulled over as directed when he drove up to the checkpoint. The officers determined that the car Davis was driving had a forged inspection sticker and that the temporary registration Davis produced had been altered. After the police arrested him for these and other traffic violations, they discovered crack cocaine on his person and drug paraphernalia in his car.

The government and the defense agree that if the roadblock complied with the Fourth Amendment, the police acted constitutionally in stopping Davis (a "seizure") and in arresting and searching him. The controversy centers on the roadblock's "primary purpose," as the Supreme Court put it in *Edmond,* 531 U.S. at 40–46, 121 S.Ct. 447, or its "principal purpose," as we put it in *McFayden,* 865 F.2d at 1312.

 The Supreme Court has derived a principle from the Fourth Amendment: a search or seizure of a person must be based on individualized suspicion of wrongdoing. *E.g., Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *but see Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). As exceptions to this principle, the Court has upheld the constitutionality of vehicle checkpoints near the border to intercept illegal aliens (*United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)), and roadblocks aimed at apprehending drunk drivers (*Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)). The Court has indicated that roadside truck weigh-stations and roadblocks to check drivers' licenses and vehicle registrations would also qualify as exceptions to the general principle. *Delaware v. Prouse,* 440 U.S. at 663 & n. 26, 99 S.Ct. 1391; *Edmond,* 531 U.S. at 39, 121 S.Ct. 447. Concerned that its excep-

tions would swallow the principle of individualized suspicion, 531 U.S. at 46–47, 121 S.Ct. 447, the Court in *Edmond* laid down a line: "When law enforcement authorities pursue primarily general crime control purposes at checkpoints ... stops can only be justified by some quantum of individualized suspicion." *Id.* at 47, 121 S.Ct. 447. Even if the police check licenses at the roadblock, their stopping of vehicles would violate the Fourth Amendment when the "primary purpose of the checkpoint program" is the "discovery and interdiction of illegal narcotics." *Id.* at 46, 34, 121 S.Ct. 447.

To the statements from *Edmond* just quoted, the Court added this qualifier in a footnote: "Because petitioners concede that the primary purpose of the Indianapolis checkpoints is narcotics detection, we need not decide whether the State may establish a checkpoint program with the primary purpose of checking licenses or driver sobriety and a secondary purpose of interdicting narcotics." *Id.* at 47 n. 2, 121 S.Ct. 447. The footnote seems divorced from the rest of the opinion. Throughout the text the Court states again and again that when the "primary purpose" of a roadblock is general crime control it is unconstitutional. *Id.* at 38, 41, 42, 44, 46, 47, 48, 121 S.Ct. 447. This more than suggests that if the "primary purpose" had been for a purpose the Court had already endorsed—such as detecting drunk drivers, or checking licenses—the roadblock would be constitutional. The record in *Edmond* suggested that enforcement of the drug laws was not simply Indianapolis's primary reason for establishing the checkpoint program, but its only reason. A sign near each of the checkpoints announced: " 'NARCOTICS CHECKPOINT ___ MILE AHEAD, NARCOTICS K–9 IN USE, BE PREPARED TO STOP.' " *Id.* at 35–36, 121 S.Ct. 447. If the city's only purpose was narcotics enforcement, it is

hard to explain why the Court framed the inquiry in terms of its "primary" purpose, unless the Court believed that it would be constitutional for a State to "establish a checkpoint program with the primary purpose of checking licenses or driver sobriety and a secondary purpose of interdicting narcotics." *Id.* at 47 n. 2, 121 S.Ct. 447.

In any event, the question left open by the *Edmond* footnote has been answered by our decision in *McFayden.* Police stopped the defendant in *McFayden* at a checkpoint operated in the same manner as the one in this case. The defendant, while retrieving his license or registration, took actions that led the police to narcotics in his car. 865 F.2d at 1309. Although decided before *Edmond, McFayden* also described the issue as whether "the principal purpose of the roadblock was to regulate vehicular traffic by allowing police to check driver' licenses and vehicle registrations." *Id.* at 1312. The court answered yes and found the roadblock constitutional on this ground, and because it satisfied several other criteria, even though it "facilitated a narcotics enforcement effort," *id.* at 1307. The checkpoint in *McFayden* was part of "Operation Cleansweep," a program "designed to attack the problem of drug dealing in D.C." *Id.* at 1308. The police determined where to place roadblocks "on the basis of community complaints about traffic and narcotics problems"; citizens in the vicinity of the *McFayden* roadblock complained about "speeding automobiles." *Id.* at 1308, 1312. In general, "traffic congestion is one serious problem that results from street drug sales in the District of Columbia." Buyers stop illegally, double-park, make U-turns, speed and disrupt the flow of traffic in the neighborhood. *Id.* at 1308, 1312. The roadblock in *McFayden* had a principal purpose of controlling the traffic problems associated with drug dealing and "[w]hatever advantage was gained in drug enforcement was coincidental to the principal purpose of the traffic roadblocks." *Id.* at 1313. While the *McFayden* court cautioned (*id.* at 1312) that it might not sustain a roadblock if it were a "subterfuge," "purportedly established to check licenses" but "located and conducted in such a way as to indicate that its *principal purpose* was the detection of crimes unrelated to licensing," it rejected the proposition that a roadblock must have as its *sole purpose* the checking of licenses and registrations. *See* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 10.8(a), at 679–80 (3d ed.1996), and the 2001 supplement thereto at 122–23.

Here the district court made several "essential findings" as Rule 12(e), FED. R.CRIM.P., required. One of the court's findings was: "The roadblock at issue was conducted in a systematic and nondiscriminatory fashion, for the principal purpose of vehicular regulation in conjunction with a police program to increase police presence and to curb drug activity." Another was that "[t]here is no evidence of subterfuge in this record." The court treated the purpose of the roadblock as a question of fact, as did the Supreme Court in *Edmond.* 531 U.S. at 40–41, 121 S.Ct. 447. *See also Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 1290–91 & n. 20, 149 L.Ed.2d 205 (2001); *Galberth v. United States,* 590 A.2d 990, 1000 n. 12 (D.C.1991). Factual findings on suppression motions may be set aside only if clearly erroneous, *see, e.g., Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Garrett,* 959 F.2d 1005, 1007 (D.C.Cir. 1992); *United States v. Mangum,* 100 F.3d 164, 170 n. 8 (D.C.Cir.1996); *United States v. Hill,* 131 F.3d 1056, 1059 n. 2 (D.C.Cir. 1997). As in civil cases, the clearly erroneous standard applies to Rule 12(e) findings based not only on testimony but also on documents. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct.

1504, 84 L.Ed.2d 518 (1985); 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2587 (2d ed. 1995).

The district court's findings rested, so far as we can tell, on the testimony of the government's sole witness. This officer said that before setting up the roadblock, the police received information about "incidents" in the southwest neighborhood where they arrested Davis. Community groups and church "activists" complained about "speeding, children were unable to play on the sidewalk, parents actually had their children playing inside the yard because they were afraid a car might go out of control or their kids might get hit or something." After obtaining this information, and information about "drugs, gun violence, robberies, [and] assaults," the officer chose the neighborhood for a "safety compliance check." The objective of "safety compliance checks" is not, the officer testified, simply to stop speeding (as any roadblock doubtless would), but also to detect "dead tags, dead inspection, no seat belt, child restraint violations, various traffic violations we would normally pull someone over in the car." The officer, who was in charge of the roadblock, briefed the other officers "on safety concerns." He gave no instructions "about looking for narcotics or firearms," and he was not aware that any of the officers at the scene were instructed about matters "unrelated to vehicle safety."

█ Regardless whether this evidence would have been sufficient under *McFayden*—an exceedingly close question—it is not sufficient under the Supreme Court's intervening decision in *Edmond*. *McFayden* treated the overall program under which the roadblock had been established as "immaterial." 865 F.2d at 1312. But *Edmond* held that "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion." 531 U.S. at 45–46, 121 S.Ct. 447. In determining the principal purpose of the safety checkpoint in this case, the district court made no findings about the Summer Mobile Force. According to a police manual, the Summer Mobile Force initiative had as its overall objective "to restore the public's confidence in the Metropolitan Police Department through the reduction and prevention of crime and violence by utilizing short-term, pro-active, high visibility enforcement techniques." Perhaps inspired by the experience of New York City, *see* GEORGE L. KELLING & CATHERINE M. COLES, FIXING BROKEN WINDOWS 108–56 (1996), the department states that it "is committed to building safe, orderly, and healthy neighborhoods throughout the District of Columbia in partnership with our community." Among the tactical approaches mentioned is a "highly trained and supervised approach to proactive traffic enforcement," using among other things roadblocks, with the goal of reducing "the number of traffic violations, accidents, and instances of aggressive driving on our city streets. Remove the automobile as the conveyance of choice by narcotics traffickers and individuals secreting guns and stolen property in the District of Columbia."

Since the district court, bound as it was by *McFayden*, does not appear to have taken these "programmatic purposes" into account, we must send the case back for further proceedings in light of *Edmond*, 531 U.S. at 48, 121 S.Ct. 447, and the Court's later opinion in *Ferguson v. City of Charleston*, 121 S.Ct. at 1291, holding that all evidence must be considered. We do not agree with defense counsel that after *Edmond* the *only* thing the district court may consider on remand is the general purpose of the overall program. The procedural posture of *Edmond*—a suit for an injunction to prevent future roadblocks for narcotics enforcement and a stipulated rec-

ord—led the Court to disregard the specific circumstances of any one roadblock. Given the very broad objectives of the Summer Mobile Force initiative, it would be impossible to discern the purpose of a particular roadblock without determining the reasons behind it. The record needs clarification in another respect. Although we know that citizens in the neighborhood complained about speeding, it is not entirely clear whether the only purpose of the police in establishing the checkpoint was to deal with that problem. The objectives of the citizens are not necessarily the objectives of the police. It is also uncertain whether, as in *McFayden*, open air drug dealing was causing the traffic problems in this neighborhood. The government had the burden of proof, of course, *see United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), but the absence of such evidence may not be entirely its fault. When the government tried to elicit information of this sort on redirect, the defense objected. All that the government's witness managed to get on the record was his opinion that there is "[v]ery high traffic" in areas where there is drug dealing, and his experience that people arrested for drug offenses are more likely to have "unregistered automobiles, altered tags, than a regular citizen." Missing is a link between the sort of traffic problems mentioned in *McFayden* and similar problems stemming from drug trafficking in the neighborhood where the police located this checkpoint.

 Several words of caution are in order. One must be careful not to fall into the trap of thinking that any "but for" cause of a roadblock represents its primary purpose within *Edmond*'s meaning. Whenever something is done for several reasons, it might not have been done in the absence of any one of those reasons. If there had not been drug dealing in the neighborhood, the *McFayden* roadblock would not have been placed there, yet its

primary purpose dealt with vehicular safety. The assumption underlying the search for the "primary purpose" is that several purposes might have moved the police to set up a particular roadblock. This is why finding the primary or predominant purpose will often prove difficult, as the Supreme Court acknowledged in *Edmond*, 531 U.S. at 46–47, 121 S.Ct. 447. It is also why findings of the district court, taking into account all of the available evidence, are entitled to great respect.

 One further matter needs to be mentioned. *McFayden* held that a checkpoint, in addition to having a legitimate primary purpose, must also "promote the state interest in a 'sufficiently productive' fashion." 865 F.2d at 1311–12 (quoting *Delaware v. Prouse*, 440 U.S. at 660, 99 S.Ct. 1391). The defense argues that the government failed to satisfy this element. Although the evidence showed that the police issued citations for 56 moving violations and 30 parking violations, and made 8 traffic arrests, "there was absolutely no evidence of how many cars in total were stopped; thus there is no way of knowing what percentage of the cars stopped were represented by the figures provided by the government." Brief for Appellant at 24. Such statistical evidence is not, however, essential. The effectiveness of the checkpoint in fulfilling its primary purpose may be demonstrated in other ways. *Michigan Dep't of State Police v. Sitz*, 496 U.S. at 454–55, 110 S.Ct. 2481, a suit to enjoin future sobriety checkpoints, found the State's program sufficiently effective not only in light of checkpoint-specific statistics, but also on the basis of expert testimony showing the effectiveness of similar checkpoints in other States. And in one of the consolidated criminal cases in *Martinez-Fuerte* the Court refused to suppress the evidence and affirmed the conviction despite the absence of any statistics revealing the number of cars stopped at the

border or the number of illegal aliens arrested. 428 U.S. at 554, 567, 96 S.Ct. 3074. "While it appears that fewer illegal aliens are apprehended there" than at other checkpoints, "it may be assumed that fewer pass by undetected, as every motorist is questioned." *Id.* at 554, 96 S.Ct. 3074. To make the legality of a seizure pursuant to a particular roadblock wholly dependent on statistics gathered after the roadblock ended would, in any event, run into the time-honored doctrine that a search or seizure cannot be justified by its success, *Byars v. United States,* 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520 (1927)—or as it is usually put, by what it turns up, *e.g., United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)—and

would ignore that the deterrent purpose of the exclusionary rule cannot be fulfilled unless the police can determine ahead of time whether their operation of a proposed checkpoint will be constitutional. In short, if the district court concludes on remand that the primary purpose of the checkpoint related to vehicular regulation, it may then rely—as the Supreme Court did in *Martinez-Fuerte*—on nonstatistical evidence or other considerations in determining whether the checkpoint furthered that purpose.

The case is remanded for further proceedings consistent with this opinion.

*So ordered.*