# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 8, 2009          Decided July 10, 2009

No. 08-7127

CANEISHA MILLS, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01061)

*Mara E. Verheyden-Hilliard* argued the cause for appellants. With her on the briefs was *Carl Messineo*.

*Todd S. Kim*, Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Peter J. Nickles*, Attorney General, and *Donna M. Murasky*, Deputy Solicitor General. *Stacy Anderson*, Assistant Attorney General, entered an appearance.

Before: SENTELLE, *Chief Judge*, and GINSBURG and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Four District of Columbia citizens (appellants) filed a motion for a preliminary injunction to enjoin further implementation of a police checkpoint program in the District of Columbia. The district court denied the motion for a preliminary injunction, holding that the appellants failed to show either irreparable harm or a substantial likelihood of success on the merits. Because we hold that the appellants' showing of irreparable harm is sufficient, and conclude that appellants have shown a substantial likelihood of success, we reverse the district court and remand for further proceedings.

## I. BACKGROUND

The neighborhood safety zone (NSZ) program was created by the Metropolitan Police Department (MPD) in response to the violence that has plagued the Trinidad neighborhood in Northeast Washington, D.C. for many years. Before this case arose, Trinidad had recently been the scene of twenty-five assaults involving firearms, five of which resulted in deaths, and six of which involved the use of vehicles. Shortly after a triple homicide in the Trinidad neighborhood on May 31, 2008, the MPD designated a portion of the neighborhood an NSZ. Pursuant to MPD Special Order 08-06, issued June 4, 2008, MPD implemented the program and erected eleven vehicle checkpoints over the course of five days at locations around the perimeter of the NSZ. This first implementation of the checkpoints took place from June 7 to June 12, 2008. On July 19, 2008, nearly a month after appellants commenced this action in the district court, the Commander of MPD's Fifth District, in response to a series of violent attacks that morning in Trinidad, requested and was granted approval for another NSZ in the Trinidad neighborhood. This second implementation of the NSZ program originally was to run from July 19 to July 24, but

was extended until July 29, 2008.

During the first implementation of the NSZ program, Special Order 08-06 set forth the parameters of the program. According to the Special Order, the original primary purpose of the program was "to provide high police visibility, prevent and deter crime, safeguard officers and community members, and create safer District of Columbia neighborhoods." This Special Order also governed the police officers' conduct at the checkpoints during the first implementation of the NSZ checkpoint program. According to the Special Order, motorists were to receive advance notice of checkpoints, which were to be marked with signs around the borders of the NSZ as well as "barricades, lights, cones, and/or flares." Officers were to stop all vehicles attempting to gain access to the NSZ area. Officers were not to stop vehicles attempting to leave the NSZ area without particularized suspicion. Officers also were not to stop individuals seeking to enter the NSZ area on foot. When motorists attempting to gain entry into the NSZ area were stopped at the checkpoint, officers were required to identify themselves to motorists and inquire whether the motorists had "legitimate reasons" for entering the NSZ area. Legitimate reasons for entry fell within one of six defined categories: the motorist was (1) a resident of the NSZ; (2) employed or on a commercial delivery in the NSZ; (3) attending school or taking a child to school or day-care in the NSZ; (4) related to a resident of the NSZ; (5) elderly, disabled or seeking medical attention; and/or (6) attempting to attend a verified organized civic, community, or religious event in the NSZ. If the motorist provided the officer with a legitimate reason for entry, the officer was authorized to request additional information sufficient to verify the motorist's stated reason for entry into the NSZ area. Officers denied entry to those motorists who did not have a legitimate reason for entry, who could not substantiate their reason for entry, or who refused to provide a legitimate

reason for entry.

Motorists who failed to provide sufficient information were refused entry into the neighborhood in their vehicles, although motorists were not charged with a criminal offense if they failed to provide a legitimate reason for entry. Officers could not conduct a search of a stopped vehicle unless individualized suspicion developed during a stop. During the first implementation of the NSZ program, only one arrest was made at a Trinidad NSZ checkpoint; the arrest was for driving while in possession of an open container of alcohol. Forty-eight of 951 vehicles stopped during the June checkpoints were refused entry. The record does not indicate whether any arrests were made during the second implementation of the program. *See Mills v. District of Columbia*, 584 F. Supp. 2d 47, 58 n.8 (D.D.C. 2008).

Between the first and second implementation of the NSZ checkpoints, but after this action commenced, the District revised its Special Order governing the program. Though the six "entry-sufficient" categories remained the same, the District, understandably concerned with running afoul of the Fourth Amendment, tweaked its approach to implementing the program. Significantly, the revised Special Order established that motorists should be asked for identification only if they claimed to be residents of the NSZ in order to verify their residency. The revised Special Order also provided that information given by the motorist need only be "reasonably sufficient" to verify the motorist's reasons for entry. The primary purpose of the NSZ program remained similar despite the revisions to other areas of the program. The revised Special Order, however, clarified that "[t]he [revised] primary purpose of an NSZ is not to make arrests or to detect evidence of ordinary criminal wrongdoing, but to increase protection from violent criminal acts, and promote the safety and security of

persons within the NSZ by discouraging–and thereby deterring–persons in motor vehicles from entering the NSZ intending to commit acts of violence."

Appellants Caneisha Mills, Linda Leaks, and Sarah Sloan were among the 48 motorists denied entry at an NSZ checkpoint during the first implementation of the NSZ checkpoints between June 7 and June 12, 2008.[1]  Each appellant was denied entry in her vehicle on account of her refusal to provide certain information. Mills refused to provide personal information regarding her identity and intended activities in the NSZ, Leaks refused to provide details about her political activity and intended community organizing, and Sloan refused to provide information about a political meeting she wished to attend.

In a press conference held on July 19, 2008, MPD Police Chief Cathy Lanier stated that she would continue to utilize NSZs "until a judge orders [her] to stop."  On June 20, 2008, the appellants filed a class action complaint seeking declaratory, injunctive, and compensatory relief. The appellants asserted that the NSZ checkpoints constituted unconstitutional seizures in violation of the Fourth Amendment.  The district court denied the appellants' motion for a preliminary injunction, holding that the appellants failed to establish irreparable harm or a likelihood of success on the merits.  This appeal followed.

## II. ANALYSIS

Appellants argue that the district court erred in denying their motion for a preliminary injunction against the District's imposition of the NSZ Program.  To prevail, appellants "must

---

[1]William Robinson was also stopped, and was originally a party to this action.  He has since passed away, however, and is no longer a part of this case.

'demonstrate 1) a substantial likelihood of success on the merits, 2) that [they] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" *Katz v. Georgetown Univ.*, 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). A district court must balance the strength of a plaintiff's arguments in each of the four elements when deciding whether to grant a preliminary injunction. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *CityFed Fin. Corp.*, 58 F.3d at 747. Accordingly, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.* (citing *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986)). "We review a district court decision regarding a preliminary injunction for abuse of discretion, and any underlying legal conclusions *de novo*." *Katz*, 246 F.3d at 688. We will overturn any of the district court's factual findings only upon a finding of clear error. *Cobell v. Norton*, 391 F.3d 251, 256 (D.C. Cir. 2004) (citing *City of Las Vegas v. Lujan*, 891 F.2d 927, 931 (D.C. Cir. 1989)).

## A.  Likelihood of Success on the Merits

Appellants' likelihood of success on the merits is dependent upon the strength of their constitutional challenge to the checkpoint program. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Without question, a seizure occurs when a vehicle is stopped at a police checkpoint. *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990); *United States v. Martinez-Fuerte*, 428 U.S. 543, 556

(1976) ("[C]heckpoint stops are 'seizures' within the meaning of the Fourth Amendment."). The Fourth Amendment, however, only proscribes those seizures that are unreasonable. U.S. Const. amend. IV. Therefore, this issue turns on whether the stops of the appellants in connection with the NSZ program were unreasonable.

The constitutionality of police checkpoints is not a new controversy. Indeed, the courts of the District of Columbia have previously considered a prior roadblock program by this same police department in the same Trinidad neighborhood. *See Galberth v. United States*, 590 A.2d 990 (1991). There is ample guidance for our review from the Supreme Court.

In *United States v. Martinez-Fuerte*, the Court considered the constitutionality of the suspicionless routine stops of vehicles at checkpoints on major roads leading away from the border. The Court held "that stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant." *Martinez-Fuerte*, 428 U.S. at 566. In the discussion of the constitutional question, the Court noted that "the need for [the judgment of a neutral magistrate] is reduced when the decision to 'seize' is not entirely in the hands of the officer in the field, and deference is to be given to the administrative decisions of higher ranking officials." *Id.* The Court also discussed the reason for the search, that is, "[i]nterdicting the flow of illegal entrance from Mexico." *Id.* at 552. In the end, while determining that the checkpoint stops were not unconstitutional, the Court noted that "[t]he principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." *Id.* at 566-67. The Court further explicitly declared that "our holding today is limited to the type of stops described in this opinion." *Id.* at 567. Obviously, the facts before the Court in a border protection stop

are far different than those before this court today. However, the Supreme Court has offered further guidance.

In *Brown v. Texas*, 443 U.S. 47 (1979), the Supreme Court considered the constitutionality of a police stop that, while not literally at a roadblock or checkpoint, was sufficiently analogous to generate an analysis that has been instructive in roadblock cases. In *Brown*, cruising police officers stopped two pedestrians, one of whom was the eventual Supreme Court litigant, in an area with a high incidence of drug traffic. Although one officer testified that "the situation 'looked suspicious and we had never seen that subject in that area before,'" the officers did not offer any specific suspicion or any reason to believe the subjects were armed. *Id.* at 49. The police demanded that the subjects identify themselves. One refused and asserted that the officers had no right to stop him. The officers charged him under a Texas statute which made "it a criminal act for a person to refuse to give his name and address to an officer 'who has lawfully stopped him and requested the information.'" *Id.* In determining the constitutionality of the stop in that case, the Court offered analysis instructive in all further cases involving a suspicionless stop constituting a seizure but short of arrest. The Court concluded that "[c]onsideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 50-51. Although we doubt that the checkpoint in this case would have survived constitutional scrutiny under the *Brown* analysis, later Supreme Court pronouncements speaking directly to issues of checkpoint seizure constitutionality make that result even more clearly compelled.

Most plainly controlling of the case before us is the Supreme Court decision in *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000). In *Edmond*, the Court considered a checkpoint program conducted by the City of Indianapolis in an effort to interdict unlawful drugs. Under the stipulated facts of the case, officers operating pursuant to directions issued by the chief of police would for a limited period of time stop all vehicles without particularized suspicion, look for signs of impairment, conduct an open view examination of the vehicle from the outside, and have a narcotics-detection dog walk around the outside of each stopped vehicle. After observing that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing," the Court observed that "we have recognized only limited circumstances in which the usual rule does not apply." *Edmond*, 531 U.S. at 37. The Court recognized that it had in the past upheld the constitutionality of a checkpoint stop for border protection, *see Martinez-Fuerte*, *supra*, and "a sobriety checkpoint aimed at removing drunk drivers from the road," *id.* (citing *Sitz*, 496 U.S. 444). But the Court stressed that "[w]e have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 41. The Court then concluded that "[b]ecause the primary purpose of the Indianapolis checkpoint program is ultimately indistinguishable from the general interest in crime control, the checkpoints violate the Fourth Amendment." *Id.* at 48. It is this rule which governs the present case, and as the purpose of the NSZ checkpoint program is not immediately distinguishable from the general interest in crime control, appellants' argument that the seizures were unconstitutional appears headed for ultimate victory.

The District argues that the primary purpose of the NSZ program as found by the district court—deterring violent, vehicle-facilitated crime—does not fit within the

unconstitutional category of checkpoint stops for purposes "ultimately indistinguishable from the general interest in crime control." Instead, the District argues, this case is governed by *Illinois v. Lidster*, 540 U.S. 419 (2004). In *Lidster*, police set up a highway checkpoint and stopped motorists for the purpose of asking them for information about a hit-and-run accident that had occurred approximately one week earlier at the same time and place. One stopped motorist, Lidster, was arrested for driving under the influence of alcohol. The Illinois Supreme Court held the stop unconstitutional, believing that *Edmond* compelled that result. The United States Supreme Court made clear that it did not.

The District seizes on language from the *Lidster* opinion to argue that that case and not *Edmond* is controlling. The District argues that because the *Lidster* opinion noted that the "general language" in *Edmond* should be read "as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering," *Lidster*, 540 U.S. at 424, the NSZ checkpoint stop should be upheld, as were the inquiry stops in *Lidster* rather than struck down as unconstitutional, as were the drug interdiction stops in *Edmond*. We think it apparent from the face of the checkpoint programs involved that the stop before us is far more like the stop in *Edmond* than in *Lidster*.

The *Edmond* stop sought to detect and deter crimes involving narcotics. The NSZ stop seeks to deter violent crimes involving motor vehicles. This would seem a distinction without a difference. In each instance the interest of the police was in general crime control, not directed to any particular suspicion or a particular crime. In neither case was there reason for the stop unrelated to the crime control purpose. The reason for stopping the individuals in each case was the possibility, without individualized suspicion, that the driver stopped might

be the potential perpetrator of an as-yet undetected, perhaps uncommitted, crime. Both of these sets of facts seem to fit equally within the rubric of "general interest in crime control." *Lidster* is unlike either one. The police in *Lidster* were investigating a crime that they knew to have occurred. They were not looking for suspects. As the *Lidster* Court stated, "information-seeking highway stops are less likely to provoke anxiety or to prove intrusive," than the investigative checkpoint considered in *Edmond*. *Id.* at 425. As the Court stressed, "[f]urther, the law ordinarily permits police to seek the voluntary cooperation of members of the public in the investigation of a crime." *Id.* The *Lidster* Court then reiterated the longstanding proposition that "'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). In short, the NSZ stop has nothing in common with the stop upheld in *Lidster* and everything in common with the unconstitutional stop in *Edmond*.

Refining the argument slightly, the District contends that the Supreme Court's category of stops serving "the general interest in crime control" extends only to seizures actually looking for evidence of crime as opposed to seizures designed to deter crime. That argument is unconvincing. Nothing in *Edmond* limited "the general interest in crime control" to only those instances where a law enforcement officer was seeking evidence of a crime. In *Edmond*, the Court recognized that a general rule exists that "a seizure must be accompanied by some measure of individualized suspicion," 531 U.S. at 41, and that "only limited circumstances [exist] in which the usual rule does not apply," *id.* at 37. The Court stressed that the only suspicionless checkpoints previously upheld were those checkpoint programs that were "designed primarily to serve

purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety." *Id.* at 41. By automatically proscribing suspicionless checkpoints with a primary purpose of serving "the general interest in crime control," the Court was concerned with placing a "check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose." *Id.* at 42. The District's argument, however, turns this paradigm on its head. Under the District's interpretation, individualized suspicion is only required when a law enforcement officer is searching for evidence of criminal wrongdoing. Any suspicionless checkpoint program therefore would be allowed so long as its primary purpose did not involve actively seeking evidence of criminal wrongdoing. The individualized suspicion requirement is the rule under the Fourth Amendment, not the exception. Accordingly, we cannot read "the general interest in crime control" so restrictively as to encompass only those checkpoints in which law enforcement officers were seeking evidence of criminal wrongdoing.

Without doubt, the *Edmond* Court did not intend the proscription of checkpoints whose primary purpose was "general interest in crime control" to be limited to those seeking narcotics, or other evidence. Instead, the Court used the phrase in what would appear to be its natural and usual sense to include investigation and deterrence.

Indeed, when this court has been confronted with constitutional challenges to police checkpoints, it has consistently treated the purpose of deterring ordinary criminal activity like drug crime as indistinguishable from the purpose of detecting such activity in the context of suspicionless roadblocks. *See United States v. Bowman*, 496 F.3d 685 (D.C. Cir. 2007); *United States v. Davis*, 270 F.3d 977 (D.C. Cir. 2001); *United States v. McFayden*, 865 F.2d 1306 (D.C. Cir.

1989). In each case the defendant sought to suppress evidence obtained at MPD roadblocks. *Bowman*, 496 F.3d at 686-87; *Davis*, 270 F.3d at 981; *McFayden*, 865 F.2d at 1308-09. In each, the MPD instituted roadblocks for the stated purpose of regulating vehicle traffic and safety. *See Bowman*, 496 F.3d at 691; *Davis*, 270 F.3d at 981; *McFayden*, 865 F.2d at 1308. And, in each, this court explained that although traffic regulation was a permissible primary purpose for suspicionless checkpoints, deterrence of drug activity and general drug enforcement were not. *See Bowman*, 496 F.3d at 692-93; *Davis*, 270 F.3d at 980; *McFayden*, 865 F.2d at 1312-13. As a result, where the district court had made appropriate findings that traffic regulation, and not general deterrence, was the primary goal of the stops, this court affirmed the convictions. *See McFayden*, 865 F.2d at 1312-13. However, where the record was insufficient to support a determination of the primary purpose, the court remanded for further fact-finding. *See Bowman*, 496 F.3d at 694-95; *Davis*, 270 F.3d at 981-82.

In short, appellants' likelihood of success on the merits is strong.

## B. Irreparable Injury

We further conclude that appellants have sufficiently demonstrated irreparable injury, particularly in light of their strong likelihood of success on the merits. *See CityFed Fin. Corp.*, 58 F.3d at 747. The harm to the rights of appellants is apparent. It cannot be gainsaid that citizens have a right to drive upon the public streets of the District of Columbia or any other city absent a constitutionally sound reason for limiting their access. As our discussion of the likelihood of success has demonstrated, there is no such constitutionally sound bar in the NSZ checkpoint program. It is apparent that appellants' constitutional rights are violated. It has long been established

that the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)). Granted, the District is not currently imposing an NSZ checkpoint, but it has done so more than once, and the police chief has expressed her intent to continue to use the program until a judge stops her.

### III. CONCLUSION

In short, we conclude that appellants have established the requisites for the granting of a preliminary injunction. They have made a particularly strong showing of the substantial likelihood of success on the merits and that they would suffer irreparable injury if the injunction is not granted. The district court did not address the other two elements of the preliminary injunction test. Accordingly, we reverse the district court and remand for further proceedings.

*So ordered.*