UNITED STATES, Appellee

v.

Benjamin AYALA, Airman First Class
U.S. Air Force, Appellant

No. 10-0013

Crim. App. No. S31550

United States Court of Appeals for the Armed Forces

Argued April 6, 2010

Decided June 9, 2010

STUCKY, J., delivered the opinion of the Court, in which BAKER
and RYAN, JJ., joined.  EFFRON, C.J., filed a separate
dissenting opinion, in which ERDMANN, J., joined.


Counsel


For Appellant:  Captain Marla J. Gillman (argued); Major Shannon
A. Bennett (on brief).

For Appellee:  Captain G. Matt Osborn (argued); Colonel Douglas
P. Cordova, Lieutenant Colonel Jeremy S. Weber, and Gerald R.
Bruce, Esq. (on brief).

Military Judge:  Gregory O. Friedland


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

United States v. Ayala, No. 10-0013/AF

Judge STUCKY delivered the opinion of the Court.

At trial, the military judge convicted Appellant of using illegal drugs, based on the results of two command-directed urinalyses conducted as follow-ups to a previous positive random drug test. The military judge concluded that the follow-up urinalyses were lawful inspections, not inadmissible searches. Whether a follow-up urinalysis constitutes an inspection turns on the purpose of that examination. We granted review of the following issue:

> WHETHER THE MILITARY JUDGE ERRED IN FINDING
> APPELLANT'S ADDITIONAL URINALYSES CONDUCTED PURSUANT
> TO UNITED STATES V. BICKEL, 30 M.J. 277 (C.M.A. 1990),
> WERE FOR A PERMISSIBLE PURPOSE.

We hold that the military judge did not err in finding that the follow-up urinalyses were conducted for permissible purposes, and affirm the judgment of the United States Air Force Court of Criminal Appeals (CCA).

I.

A special court-martial consisting of a military judge sitting alone convicted Appellant, consistent with his plea, of one specification of using marijuana. Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2006). Contrary to his pleas, the military judge convicted Appellant of two specifications of using marijuana at other times, and one specification of using cocaine. Id. The convening authority

2

approved the adjudged sentence:  a bad-conduct discharge,

confinement for five months, forfeiture of $800.00 per month for

five months, and reduction to the lowest enlisted grade.  The

CCA affirmed.  United States v. Ayala, No. ACM S31550, 2009 CCA

LEXIS 266, at *9, 2009 WL 2211462, at *3 (A.F. Ct. Crim. App.

July 15, 2009) (unpublished).

## II.

On January 30, 2007, the staff judge advocate (SJA)

proposed a new drug policy to the wing commander.  "This policy

would require all members whose urine tests positive for illegal

drugs to provide another sample for testing by the end of the

first duty day following receipt of a positive test result."

The SJA provided several reasons for his recommendation,

including:

- "If the only evidence available at trial of illegal drug use is the positive urinalysis test, court members are frequently hesitant to convict the member for illegal drug use."

- "Because of the increased opportunity for acquittal in illegal drug use prosecutions based solely on a positive urinalysis test, more often than not, the accused elects to litigate his case at trial.  The costs associated with such litigation [are expensive]."

- "The proposed Urinalysis Re-Inspection provides an opportunity to secure a second positive test result against the member. . . . [which] would be available at trial. . . . [and] substantially increases the likelihood of conviction [or guilty plea] . . . ."

- Noting United States v. Bickel, 30 M.J. 277 (C.M.A. 1990), the SJA recommended the re-inspection "to further aid in

> detecting drug abusers within our active duty population, potentially <u>decrease litigation risks and costs, and potentially aid in swifter judicial action</u>."

Emphases added.

Two days later, on February 1, 2007, the wing commander announced the new policy and stated his purpose for adopting it:

> The purpose of urinalysis inspection is to ensure the <u>security, military fitness, and good order and discipline</u>. To fulfill that purpose, follow-up urinalysis inspection will be utilized as a continuation of the original random inspection. The unlawful use of controlled substances by a member of this installation has the potential to seriously undermine our missions, endanger the lives of other members, and negatively impact the nation's security. Follow-up urinalysis inspections are part and parcel to the random urinalysis inspection program at [Davis-Monthan Air Force Base], and <u>not a criminal investigative tool</u>, regardless of the admissibility of such test results as evidence in [UCMJ] actions.

Emphases added.

In June 2008, Appellant was randomly selected to provide a urine sample. In early July, when Appellant's sample was reported as being positive for marijuana, he was directed to provide another urine sample for testing, pursuant to the policy established by the wing commander on February 1, 2007. A few weeks later, when the second sample tested positive for marijuana, Appellant was again directed to provide another urine sample for testing. This test yielded a positive result for both marijuana and cocaine.

At trial, Appellant moved to suppress the follow-up examinations as subterfuge searches.  As evidence on the motion, the Government submitted, without defense objection, an affidavit from the then-retired wing commander, which stated:

> The purpose of the policy was to ensure security, military fitness, and good order and discipline.  As I stated in the 1 Feb [20]07 memorandum, the unlawful use of controlled substances by a member assigned to the installation has the potential to seriously undermine the mission, endanger the lives of other members, and negatively impact national security. Follow-up urinalysis inspections are part of the random urinalysis inspection program . . . and not a criminal investigation tool.

Applying the clear and convincing evidence standard, the military judge found that Appellant's urine samples were collected "pursuant to a valid inspection" in accordance with Military Rule of Evidence (M.R.E.) 313, and denied the motion.

### III.

Evidence obtained from inspections conducted in accordance with M.R.E. 313 "is admissible at trial when relevant and not otherwise inadmissible" under the Military Rules of Evidence. M.R.E. 313(a).

> An "inspection" is an examination of the whole or part of a unit, organization, [or] installation, . . . conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, [or] installation . . . . An examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary

> proceedings is not an inspection within the meaning of
> this rule.

M.R.E. 313(b) (emphasis added).

### A.

At trial, the Government conceded that it had to establish by clear and convincing evidence that the examinations were not made for the primary purpose of obtaining evidence for trial.[1] The military judge found that the Government had established by clear and convincing evidence that the primary purpose of the second and third urinalyses was not to obtain evidence for courts-martial, given the wing commander's sworn statements. The military judge further reasoned that an otherwise valid inspection does not become an illegal search simply because a commander consults with a legal officer or uncovers incriminating evidence.

### B.

We have in the past held that "the military judge's finding regarding the 'primary purpose' is a matter of fact, the issue of whether the examination is an inspection is a matter of law that this Court will review de novo." United States v. Gardner, 41 M.J. 189, 191 (C.M.A. 1994); accord United States v. Shover,

---

[1] As the Government agreed at trial that it had to prove by clear and convincing evidence that the examination was an inspection, we need not determine whether that is the appropriate standard in this case.

45 M.J. 119, 122 (C.A.A.F. 1996).[2]  "Purpose and intent . . . are themselves classic questions of fact."  United States v. McCarthy, 47 M.J. 162, 165 (C.A.A.F. 1997).  Although the commander's stated purpose of conducting an examination is not dispositive of the issue, the "primary purpose" of an examination is solely dependent upon the intent of the person who ordered the examination.  This is a question of historical fact for the military judge to determine and which we review for clear error.  Shover, 45 M.J. at 122; cf. McCarthy, 47 M.J. at 165 (reviewing for clear error whether brig officials had an intent to punish); United States v. Curtis, 33 M.J. 101, 105 (C.M.A. 1991) (reviewing for clear error the military judge's ruling as to discriminatory intent of trial counsel in exercising a peremptory challenge).[3]

---

[2] More recently, we suggested that the "primary purpose" of an examination might be a mixed question of fact and law.  United States v. Jackson, 48 M.J. 292, 295 (C.A.A.F. 1998) (citation and quotation marks omitted).

[3] The Supreme Court has held that questions of intent or purpose are still questions of fact reviewable for clear error, even if the result in a case turns on the factual finding.  See Pullman-Standard v. Swint, 456 U.S. 273, 286 & n.16, 287-88 (1982) (civil context; Fed. R. Civ. P. 52(a)); Maine v. Taylor, 477 U.S. 131, 145 (1986) (criminal context) ("[T]he considerations underlying Rule 52(a) -- the demands of judicial efficiency, the expertise developed by trial judges, and the importance of firsthand observation -- all apply with full force in the criminal context . . . .  Accordingly, the 'clearly erroneous' standard of review long has been applied to nonguilt findings of fact by district courts in criminal cases.") (citation omitted); see also Lynch v. City of New York, 589 F.3d 94, 105 (2d Cir. 2009) (primary purpose of breathalyzer policy); United States v.

IV.

In this case, the military judge had three pieces of evidence before him relating to the purpose of the re-examinations: (1) the SJA's legal memorandum to the wing commander focusing on the benefits of additional urinalyses in obtaining convictions; (2) the wing commander's subsequent policy memorandum to his commanders and first sergeants stating military purposes; and (3) the wing commander's affidavit reiterating those military purposes.

While the SJA's memorandum is strong evidence of his intent in recommending the retesting policy be implemented, our focus is on the commander's purpose in ordering the examination, and we do not attribute to the commander "every instance of advice or expression of opinion by an SJA." United States v. Hamilton, 41 M.J. 32, 37 (C.M.A. 1994).

The wing commander initially stated that his purpose in ordering the re-examinations was to ensure "security, military fitness, and good order and discipline," and he subsequently reaffirmed that purpose in his affidavit. That comports with M.R.E. 313(b)'s definition of an inspection: "an examination . . . conducted as an incident of command the primary purpose of which is to determine and to ensure the

_____

Green, 293 F.3d 855, 859 (5th Cir. 2002) (primary purpose of checkpoint); United States v. Davis, 270 F.3d 977, 980 (D.C.

8

security, military fitness, or good order and discipline of the unit." Appellant offered no objection to the admission of the wing commander's affidavit. If Appellant had desired to further test the purpose of the policy, he could have sought to depose the wing commander or demand his presence at trial so he would be subject to cross-examination. Appellant did not do so, and did not present any other evidence showing that the examination's purpose was other than the one announced by the wing commander.

As such, the military judge's finding that the Government had proved by "clear and convincing" evidence that the examination was conducted "to ensure the security, military fitness and good order and discipline of the 355th Wing" was not clearly erroneous. That being the case, the military judge did not err in finding that Appellant's additional urinalyses were conducted for a permissible purpose.

V.

The judgment of the United States Air Force Court of Criminal Appeals is affirmed.

---

Cir. 2001) (same).

United States v. Ayala, No. 10-0013/AF

EFFRON, Chief Judge, with whom ERDMANN, Judge, joins (dissenting):

A drug testing program based upon misapplication of the law governing inspections produced the evidence used to convict Appellant of the charges at issue.  The prosecution at trial failed to meet its burden of demonstrating by clear and convincing evidence that the evidence was obtained from a lawful inspection.  For the reasons set forth below, I would set aside the findings at issue and remand the case for further proceedings.

I.  SEARCHES AND INSPECTIONS

Military law provides a critical distinction between searches and inspections.  Under the Military Rules of Evidence (M.R.E.), a search of a person or area for specified property or evidence may be authorized by competent military or civilian authority based upon probable cause.  M.R.E. 315.  In the absence of probable cause, evidence obtained from a reasonable search is admissible under the limited circumstances specified in M.R.E. 314.

M.R.E. 313, which governs military inspections, contains substantive and procedural provisions that reinforce the distinction between inspections and searches.  In pertinent part, the rule defines an inspection as "an examination . . .

conducted . . . as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline, of the unit . . . ." M.R.E. 313(b). An inspection may include an examination to ensure that "personnel are present, fit, and ready for duty." Id. An inspection may include "an examination to locate and confiscate unlawful weapons and other contraband," and may include an order "to produce body fluids, such as urine . . . ." Id. However, an "examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection" under the rule. Id. In short, the determination of whether an examination constitutes an inspection or a search depends on its primary purpose.

When "a purpose of an examination is to locate weapons or contraband," the rule sets forth a specific procedure for determining whether the examination is a search or an inspection. Id. In pertinent part, the rule provides that when "specific individuals are selected for examination . . . the prosecution must prove by clear and convincing evidence that the examination was an inspection within the meaning of this rule." Id.

Depending on the circumstances, a drug test designed to locate illegal substances may constitute an inspection or a

search.  As with any other examination for contraband, the determination of whether a drug test is an inspection or a search depends on whether the prosecution can meet the burden of establishing by clear and convincing evidence that the circumstances constituted an inspection under the rule.  The distinction is crucial.  If the examination is a search, the evidence is inadmissible unless the prosecution can establish that the search was an authorized probable cause search under M.R.E. 315, or that the search fits within an exception under M.R.E. 314.  If, however, the prosecution establishes by clear and convincing evidence that the examination constituted an inspection, then the evidence is admissible without regard to the requirements of M.R.E. 314 or 315.  See M.R.E. 313(a).

## II.  THE DRUG TESTING PROGRAM DESIGNED BY THE SJA

In the present case, the SJA recommended that the unit commander approve and implement the SJA's proposal for a "Urinalysis Re-Inspection Policy."  Under the SJA's proposed policy, servicemembers whose urine tested positive for illegal drugs would be required to provide another sample for testing. The SJA included with his policy proposal an "attached memorandum" for the commander to sign to implement the program.

The SJA's recommendation memorandum describes, defends, and recommends a program of drug testing that focuses expressly and

3

directly on the prosecution of drug cases.  The SJA informed the commander that:  "If the only evidence available at trial of illegal drug use is the positive urinalysis test, court members are frequently hesitant to convict the member for illegal drug use."  The SJA expressed concern that "the increased opportunity for acquittal in illegal drug use prosecutions based solely on a positive urinalysis test," meant that "more often than not, the accused elects to litigate his case at trial," leading to "costs associated with such litigation . . . ."

The SJA further stated that the proposed policy would remedy this problem by creating the potential for the court-martial to consider two positive test results.  In his opinion, that would "increase[] the likelihood of conviction if the trial is litigated"; establish "a significant[] likelihood that the member would plead guilty"; and incentivize members to "request early and rapid disposition of charges associated with the initial positive test before the results of the second test are known."  The SJA recommended that the commander establish the retesting program "to further aid in detecting drug abusers within our active duty population, potentially decrease litigation risks and costs, and potentially aid in swifter judicial action."

The SJA's recommendation memorandum, infused with concern about the litigation of drug cases, constituted a proposal to

use drug testing "for the primary purpose of obtaining evidence for use in a trial by court-martial or other disciplinary proceedings."  M.R.E. 313(b).  As such, the proposal amounted to a proposal to conduct searches, not inspections.  See id.

### III.  THE COMMANDER'S IMPLEMENTING MEMORANDUM

Two days after receiving the SJA's proposal, the commander signed an implementing memorandum entitled "Urinalysis Re-Inspection."  The implementing memorandum set forth the program's requirements and included the following:

> The purpose of urinalysis inspection is to ensure the [sic] security, military fitness, and good order and discipline.  To fulfill that purpose, follow-up urinalysis will be utilized as a continuation of the original random inspection.  The unlawful use of controlled substances by a member of this installation has the potential to seriously undermine our missions, endanger the lives of other members, and negatively impact the nation's security.  Follow-up urinalysis inspections are part and parcel to the random urinalysis inspection program [at the base], and not a criminal investigative tool, regardless of the admissibility of such test results as evidence in Uniform Code of Military Justice actions.  Follow-up urinalysis inspections should not interfere with or impede any potential criminal investigation.

Subsequently, at trial, the Government introduced into evidence a two-paragraph affidavit from the commander taken approximately twenty months after implementation of the policy. In the affidavit, which echoed the implementing memorandum, the commander stated:

5

> The purpose of the policy was to ensure security, military fitness, and good order and discipline. As I stated in the 1 Feb 07 memorandum, the unlawful use of controlled substances by a member assigned to the installation has the potential to seriously undermine the mission, endanger the lives of other members, and negatively impact national security. Follow-up urinalysis inspections are part of the random urinalysis inspection program at Davis-Monthan AFB, and not a criminal investigation tool.

In the present appeal, the findings at issue were based on evidence obtained under the retesting program. The military judge denied a defense motion to suppress the evidence, ruling that the retesting program constituted a valid inspection.

## IV. DISCUSSION

The SJA provided the commander with a detailed recommendation for a program that would serve the purpose of enhancing the prosecution's litigation posture in drug testing cases. Under M.R.E. 313(b), an "examination made for the primary purpose of obtaining evidence for use in a trial by court-martial or in other disciplinary proceedings is not an inspection within the meaning of this rule." Do the brief statements in the implementing memorandum, echoed in the commander's affidavit, meet the Government's burden to establish by "clear and convincing evidence that the examination was an inspection" under M.R.E. 313(b)?

The SJA's policy proposal to the commander came in the form of a recommendation. As such, the commander was free to reject the SJA's views. In the two-day period between receipt of the SJA's recommendation and issuance of the commander's implementing memorandum, it is possible that the commander engaged in or otherwise obtained independent legal research, identified the deficiencies in the SJA's proposal, rejected the SJA's approach, and drafted his own implementing memorandum. Did the prosecution prove, by clear and convincing evidence, that the commander did so?

The Government had the opportunity at trial to demonstrate that the implementing memorandum signed by the commander differed from the draft attached to the SJA's recommendation memorandum, but the Government did not place the draft into evidence or otherwise offer evidence on that matter. The Government had the further opportunity to offer testimony by the commander, the SJA, or other officials to demonstrate that the commander had rejected the policy's purpose expressed in the SJA's recommendation memorandum. The Government did not do so. The prosecution offered no evidence on those points, and the military judge entered no findings of fact as to whether the commander had rejected or adopted the views of his SJA.

The record in this case reflects two competing narratives. In one, the SJA drafted a policy for an improper purpose,

7

provided the commander with an implementing memorandum that masked that purpose behind the facade of an inspection policy, and the commander adopted the policy in that context.  In the second, the SJA drafted a policy for an improper purpose, the commander rejected that purpose, and the commander drafted a new implementing policy with a proper purpose.  In the face of the SJA's detailed and unambiguous recommendation that the commander adopt a program to produce evidence for use in courts-martial, the prosecution was obligated to fill in the details -- to demonstrate by clear and convincing evidence that the commander rejected the SJA's improper purpose for the program and that he authorized an inspection program for a proper purpose.  The prosecution did not do so.  Because the prosecution failed to meet its burden, I respectfully disagree with the majority's decision to affirm.